LESSEE OF MORDECAI LEVY, ELIZABETH LEVY, CHAPMAN LEVY AND ROSINA HIS WIFE, BELLA HART, BELLA COHEN, RHINA MORDECAI, FLORA LEVY AND JACOB HENRY v. PETER M'CARTEE.

Under the laws of New York, one citizen of the state cannot inherit in the collateral line to the other, when he must make his pedigree or title through a deceased alien ancestor.

The legislature must be presumed to use words in their known and ordinary signification, unless that sense be repelled by the context. "The common law" is constantly used in contradistinction to the statute law.

Descents are, as is well known, of two sorts, lineal, as from father to son, or grandfather to son or grandson; and collateral, as from brother to brother, and cousin to cousin, &c. They are also distinguished into mediate and immediate. But here the terms are susceptible of different interpretations, which circumstance has introduced some confusion into legal discussions, since different judges have used them in different senses. A descent may be said to be mediate or immediate in regard to the mediate or immediate descent of the *estate* or *right;* or it may be said to be mediate or immediate, in regard to the *mediateness* or immediateness of the *pedigree* or *degrees* of *consanguinity.* Thus a descent from the grandfather, who dies in possession, to the grandchild, the father being then dead, or from the uncle to the nephew, the brother being dead, is in law an immediate descent, although the one is collateral and the other lineal; for the heir is in the *per,* and not in the *per* and *cui.* On the other hand, with reference to the line of pedigree or consanguinity, a descent is often said to be immediate, when the ancestor from whom the party derives his blood is immediate and without any intervening link or degree; and mediate when the kindred is derived from him, mediante altero, another ancestor intervening between them.

That an alien has no inheritable blood, and can neither take land himself by descent, or transmit land from himself to others by descent, is common learning.

The case of Collingwood v. Pace, 1 Ventris's Rep. 413, furnishes conclusive evidence that by the common law, in all cases of mediate descents, if any mediate ancestor through whom the party makes his pedigree as heir is an alien, that is a bar to his title as heir.

THIS case came before the court on a certificate of division in opinion of the judges of the circuit court of the United States for the southern district of New York.

In that court the lessee of the plaintiffs instituted an action of ejectment for the recovery of certain real estate in the city of New York. The jury found the following special verdict.

And the jurors aforesaid, upon their oaths aforesaid, do further find, that, at the time of the commencement of this suit, to

wit, on the 22d day of April in the year 1828, the said defendant, Peter M'Cartee, was in the possession of the lands and premises in question in this suit, known and described as a house and lot numbered forty-seven, fronting on Murray street, in the city of New York. And the jurors aforesaid, upon their oaths aforesaid, do further find, that Philip Jacobs, late of the city of New York, on the 6th day of October, in the year 1818, was seised in fee simple of the said premises in question, and on that day the said Philip Jacobs, being so seised thereof, and leaving no child born to him, the said Philip Jacobs, but his wife Elizabeth was then pregnant of a female child, which was born alive on the 23d day of January in the year 1819, which female child continued to live until the 5th day of April in the year 1821, and then the said child died without issue. And the jurors aforesaid, upon their oaths aforesaid, do further find, that the said Philip Jacobs was born in Germany, and that he came to the city of New York before the year 1772, where he resided in that year, and that he continued to reside there until his death. And the jurors aforesaid, upon their oaths aforesaid, do further find, that the said Philip Jacobs had one brother only, and his name was Simon Jacobs, who was also born in Germany, but who went to England, and resided in London from the year 1765 till his death, in the year 1807; that said Simon Jacobs never came to America; that said Simon Jacobs had two sons, to wit, Jacob and Abraham; that the said son Jacob came from London to New York in the year 1808, and remained at New York a short time and then went to Canada, where he soon after died, having never been married; and the other son of said Simon Jacobs never was in America, and now resides in England: and the said Philip Jacobs also had a sister, who was born in Germany, and lived and died there, leaving several children, born and residing there. And the jurors aforesaid, upon their oath aforesaid, do further find, that the father and mother of the said Philip Jacobs were born in Germany, and they both died before the death of said Philip Jacobs. And the jurors aforesaid, upon their oaths aforesaid, do further find, that Leipman Cohen was brother of the mother of the said Philip Jacobs; that the said Leipman Cohen and his wife.

were also born in Germany; that they had children, three sons, to wit, Philip, Moses and Elias; and three daughters, Jane, Mary, and Catharine; that all the said children of Leipman Cohen were born in Germany; that said Leipman Cohen, with his said children, removed to England many years before the year 1822, and continued to reside in England until his death. And the jurors aforesaid, upon their oaths aforesaid, do further find, that the said Philip, son of Leipman Cohen, came from London to America, and resided in South Carolina from the year 1772 until the year 1786, when he died without issue, having never been married. And the jurors aforesaid, on their oaths aforesaid, do further find, that Moses Cohen, son of the said Leipman Cohen, came from London to the city of New York in the year 1772; that in the same year the said Moses Cohen went to Charleston, in South Carolina, where he married Judith de Lyon; that he soon after removed to Savannah, in Georgia, and resided there from the year 1774 until his death, which occurred in the year 1791; that the said Moses Cohen had two daughters of his said marriage, to wit, Rhina and Bella, who were born in Charleston or Savannah aforesaid, and the said Rhina is now forty-one years of age, and is the widow of Mordecai, and was such widow at the commencement of this suit; the said Bella Cohen is now forty years of age; and the said Rhina and Bella have resided within the United States of America ever since their birth. The said Bella Cohen has never been married. The said Rhina and Bella are now alive, and reside in Charleston aforesaid, and are the only children of said Moses Cohen, and are two lessors of the plaintiff in this suit. And the jurors aforesaid, upon their oaths aforesaid, do further find, that Mary, one of the daughters of said Leipman Cohen, was lawfully married to Mordecai Levy, in London aforesaid, where she and her said husband continued to reside until their death; and they had of such marriage five children, to wit, one son named Emanuel, and four daughters, to wit, Jane, Bella, Hannah and Flora, which children were all born in London aforesaid; and they all came to Charleston, in South Carolina, between the year 1788 and the year 1792. The said Bella Levy afterwards married Daniel Hart, and is now his widow, and resides in Charleston aforesaid. The said Hannah Levy is now the wife

[Lessee of Levy et al. v. M'Cartee.]

of Moses Davies, and resides in the city of New York.    Said
Flora Levy married Michael Emanuel before she came from
London to Charleston; and she and her said husband both died
in Charleston, in South Carolina, leaving their children there,
to wit, Michael, Nathan, Simon, Joel, Charlotte, and another
daughter, whose name is unknown.    The children of said
Flora, by her said husband Michael Emanuel, were all born in
England.    The said Charlotte, and the other daughter of Flora
Emanuel, whose name is unknown, were never married, and
they are both dead.    And the jurors aforesaid, upon their oaths
aforesaid, do further find, that the said Emanuel Levy, the
son of Mary and Mordecai Levy, died in the year 1816, leav-
ing lawful issue, to wit, a son named Mordecai Levy, one of
the lessors of the plaintiff, now living in the state of South
Carolina; a daughter, Flora, who married Chapman Levy of
South Carolina, and died in the year 1823, leaving a daughter
named Flora, one of the lessors of the plaintiff, now living in
South Carolina aforesaid, and six years old.    Said Emanuel
Levy also left another daughter named Rosina, who was mar-
ried to the said Chapman Levy after the death of her said sis-
ter Flora.    The said Chapman Levy and Rosina his wife, are
two of the lessors of the plaintiff, and reside in the state of
South Carolina aforesaid; and the said Rosina has died since
the commencement of this suit, leaving an infant son of her
said marriage, named Edward Anderson Levy; and the said
Emanuel Levy also left a daughter named Elizabeth, who is
now living, aged fifteen years, and is one of the lessors of the
plaintiff, and resides in South Carolina aforesaid.    All the said
children of the said Emanuel Levy were born in Charleston
aforesaid, and the said Chapman and all his children were born
in South Carolina    And the jurors aforesaid, upon their oaths
aforesaid, do further find, that Catharine, one of the said daugh-
ters of Leipman Cohen, died unmarried and while an infant;
that the son of said Leipman Cohen, named Elias, had chil-
dren and is dead; and that the said Elias and his children were
born in Germany, and have never been in America.    And the
jurors aforesaid, upon their oaths aforesaid, do further find, that
the said Leipman Cohen and his wife, and their children, and
the said Philip Jacobs and his said brother Simon Jacobs, and
their father and mother, were all natives of Germany, and

were all Jews.   And the jurors aforesaid, upon their oaths
aforesaid, do further find, that the said land and premises in
question in this suit are of the value of more than two thou-
sand dollars.   And the jurors aforesaid, upon their oaths afore-
said, do further find, that, on the 7th day of September, in the
year 1818, the said. Philip Jacobs, being seised in fee simple
of the said lands and premises, made his. last will and testa-
ment in writing, and signed, sealed and published, and declared
the same as and for his last will and testament, in the presence
of three credible witnesses, who, at his request, and in his
presence, and in the presence of each other, severally sub-
scribed their names as witnesses thereto; that the said will re-
mained unrevoked and uncancelled at the time of the death of
the said Philip Jacobs; and which will and testament is in the
words and figures following, to wit:

After giving certain. legacies, and making provision for his
wife, the testator proceeds to dispose of his real estate as fol-
lows:

"It is my will, that if, at the time of my decease, there shall
be any child of mine alive, that then all the rents and profits
of my real estate shall be received by my executors hereinafter
named, or the survivor or survivors of them, and be applied
by him or them to the support, maintenance and education of
such child, until such child attain the age of twenty-one years,
or intermarry; and if, from the yearly application of such rents
and profits to the purposes aforesaid, there should be a surplus
remaining, the said executors, or the survivor or survivors of
them, shall, from time to time, in his or their discretion, in-
vest the same in some safe stock, for the benefit of said child,
to be paid over to such child at the age of twenty-one years,
or on marriage, whichever event shall first take place; and that
my said executors, or the survivor or survivors of them, re-
ceive for such their trouble and attention such sums as the law
may allow.   Item—After the payment of all legacies and other
bequests contained in this my last will, I do hereby give, de-
vise and. bequeath all the rest, residue and remainder of my
estate, real and personal, to the Orphan Asylum Society in the
city of New York, to be applied to the charitable purposes for
which said association was established; this bequest to take
effect immediately after all other debts and legacies are paid,

if I should leave no child at the time of my death, or, if I should leave a child, then upon the death, intermarriage, or the attaining the age of twenty-one years by such child. Item—I do hereby devise and bequeath unto my said executors, or the survivor or the survivors of them, or such of them as may act in the premises, all my real estate, of whatsoever nature or kind the same may be, subject to the trusts aforesaid; and it is my will, that whenever such child shall attain the age of twenty-one years, or marry, that my real estate be sold by my said executors, or the survivor or survivors of them, or such of them as may act herein, and the one half of the proceeds thereof paid to my said child, if the said child shall attain the age of twenty-one years or marry. And lastly, I do nominate and appoint my worthy friends, Peter M'Cartee, Richard Cunningham and John Anthon, all of the city of New York, Esqs., to be the executors of this my last will and testament. In witness whereof, I, the said Philip Jacobs, have hereunto set my hand and seal, the 7th day of September 1818.

[L. s.]                              "PHILIP JACOBS."

But whether or not, upon the whole matters aforesaid, by the jurors aforesaid in form aforesaid found, the said Peter M'Cartee is guilty of the trespass and ejectment above mentioned, the jurors aforesaid are ignorant; and therefore they pray the advice of the said circuit court of the United States of America for the southern district of New York, in the second circuit; and if, upon the whole matter aforesaid, it shall seem to the said court that the said plaintiff is entitled to the possession of the said land and premises claimed by the plaintiff in this suit, or of any part thereof, then the jurors aforesaid, upon their oath aforesaid, say, that the said Peter M'Cartee is guilty of the trespass and ejectment aforesaid, in manner and form as the said James Jackson hath above thereof complained against him; and in that case they assess the damages of the said James Jackson, on occasion of the trespass and ejectment aforesaid, besides his costs and charges by him about his suit in that behalf expended, to six cents, and for his costs and charges to six cents.

But if, upon the whole matter aforesaid, it shall seem to the said court that the plaintiff is not entitled to the possession of the said land and premises so claimed by the plaintiffs as afore-

said, nor of any part thereof, then the jurors aforesaid, upon their oaths aforesaid, say that the said Peter M'Cartee is not guilty of the trespass and ejectment aforesaid, in manner and form as the said James Jackson hath above thereof complained against him.

And at the October term of the court 1829, the cause came on for argument upon the said special verdict.

And at the said argument before the said judges, it was contended by the plaintiff's counsel, on his part, that the said lessors, Bella Cohen and Rhina Mordecai, were capable of taking the premises described in said special verdict, whereof the said Philip Jacobs died seised, as therein stated, as heirs at law of the said Jacobs, and his said child; and that the said estate descended and came to the said Bella and Rhina, notwithstanding the alienism of the mother of the said Philip Jacobs, and his maternal uncle, Leipman Cohen, and their father; but on the part of the defendant, it was contended by his counsel, that, by reason of the said alienism of the said mother of the said Philip Jacobs, and his said maternal uncle, the said estate did not descend and come to Bella Cohen and Rhina Mordecai; and upon this question, which thus occurred before the said court, the opinions of the said judges were opposed; and upon request of the counsel for the plaintiff, the point on which said disagreement happened is stated as above set forth, under the direction of the said judges, in order to be certified to the Supreme Court of the United States.

The case was argued by Mr Hoffman for the lessors of the plaintiffs, and by Mr Wirt for the defendants.

Mr Justice STORY delivered the opinion of the Court.

This case comes before the court upon a certificate of division of opinion of the judges of the circuit court for the southern district of New York, in a case stated in a special verdict.

Philip Jacobs, an American citizen, died in 1818 seised of certain real estate in the state of New York, having made his last will and testament; but the land in controversy in the present suit (which is an ejectment) is supposed by the plaintiff to be intestate estate. Two of the lessors of the plaintiffs, Bella Cohen and Rhina Mordecai are citizens of South Carolina, and claim to be the heirs at law of the testator and of his

[Lessee of Levy et al. v. M'Cartee.]

posthumous child, and as such are entitled to the premises. They are the children of Moses Cohen, who was the son of Leipman Cohen, an alien, and the maternal uncle of the testator, and as such claim to be his next of kin. The mother of the testator (who was also an alien) and the said Leipman Cohen and Moses Cohen are dead. The testator died, leaving his wife pregnant, who was afterwards delivered of a posthumous child, who died in infancy in 1821, and who took certain estate under the will, not now material to be mentioned. Under these circumstances the question arises, whether the said lessors of the plaintiffs, notwithstanding the alienage of the intermediate ancestors through whom they make their pedigree, are capable of taking the premises by descent from the testator or his posthumous child, as heirs at law under the laws of New York; and this is the question upon which the judges in the court below were divided in opinion. It resolves itself into this; whether one citizen can inherit in the collateral line to another, when he must make his pedigree or title through a deceased alien ancestor.

The question is one of purely local law, and as such, must be decided by this court. By the thirty-fifth article of the constitution of New York of 1777, it was ordained and declared, "that such parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on the 19th of April 1775, shall be and continue the law of this state, subject to such alterations and provisions as the legislature of this state shall from time to time make concerning the same." By the statute of 11 and 12 William III. chap. 6, it is enacted, "that all and every person or persons, being the king's natural born subject or subjects, *within any of the king's realms or dominions,* shall and may hereafter lawfully inherit and be inheritable as heir or heirs, &c., and make their pedigrees and titles by descent from any of their ancestors, lineal or collateral, although the father and mother, or fathers and mothers, or other ancestor of such person or persons, by, from, through, or under whom he, she or they shall or may make or derive their title or pedigree, were or was, or is or are, or shall be born out of the king's allegiance, &c. as freely, &c. as if such father, &c. or

other ancestor, &c. &c. had been naturalized or natural born subjects, &c."

It has been argued at the bar that this statute of William III. extending to all his subjects, within all his dominions, constituted a part of the statute law of England which was in force, and formed a part of the law of New York in the year 1775; and as such was recognized by the constitution of New York. But, assuming for the sake of the argument that this is so, still the inquiry will remain, whether it was in force in New York at the time of the present descent cast; for if it was at that time repealed, it has no bearing on the present case. By an act of the legislature of New York, passed on the 27th of February 1788, chap. 90, sect. 38, it is enacted, "that none of the statutes of England or Great Britain shall be considered as laws of this state." And by the statute of descents of New York, of the 23d of February 1786, chap. 12, it is enacted "that in all cases of descents not particularly provided for by this act, the common law shall govern." These statutes were in full force at the time of the descent cast in the present case; and of course govern the rights of the parties.

It has been argued, that the reference to the common law in the statute of descents of 1786, includes not only the common law properly so called, but the alterations and amendments which had been made in it by British statutes antecedent to the American revolution; and that the repeal of the British statutes by the act of 1788 repealed them only as statutes, but left them in full vigour and operation so far as they then constituted a part of the law of New York: thus making them in some sort a part of its common law. We cannot yield to the argument in either respect. The legislature must be presumed to use words in their known and ordinary signification, unless that sense be repelled by the context. The common law is constantly and generally used in contradistinction to statute law. This very distinction is pointed out in the clause of the constitution of New York, already cited, " such parts of the *common law* of England, and of the *statute* law of England and Great Britain, and of the acts, &c. which did form the law of the said colony on the 19th of April 1775, shall continue the law of the state." It is too plain for argument, that the common law is here spoken of in its appropriate sense, as the un-

written law of the land, independent of statutable enactments. The same meaning must be applied to it in the act respecting descents of 1786. That act propounds a scheme of descents varying in many respects from the common law; and then provides that in all cases of descent, not provided for by the act, the common law shall govern. If it had been intended to recognize any statute enactments of England, we should naturally expect to find some clear expression of such an intention by some appropriate words. None such are given; and it is therefore not to be doubted, that the common law canons of descent were referred to, and made the basis of descent in all cases not otherwise positively provided for. In England, the canons of descent by the common law are never confounded with descents specially authorised by statute: and the statute of New York refers not to any peculiar law of that state, then existing; but to the common origin of our jurisprudence, the common law of England.

There is still less reason for giving the meaning contended for to the repealing clause of the act of 1788; for that would be a plain departure from the very words of the act, without any necessity for such a construction. The words are " that none of the *statutes* of England, &c., shall be considered as laws of this state." The " statutes of England" can mean nothing else but the acts of parliament. The object was not to repeal some existing laws, but to repeal laws then in force in New York. It would be almost absurd to suppose that the act meant to repeal the statutes of England, which had no operation whatever in that state. What were the British statutes then in force? plainly those referred to, and continued in force by the thirty-fifth article of the constitution already quoted. The repeal then was co-extensive with the original adoption of them. In any other view of the matter, this extraordinary consequence would follow, that the legislature could solemnly perform the vain act of repealing, as statutes, what, in the same breath, it confirmed as the common law of the state; that it would propose a useless ceremony; and by words of repeal would intend to preserve all the existing laws in full force. And this, it may be added, it would be doing at the same time, by contemporaneous legislation, at the same session, as well as in the same act, it was revising, and incorporating into the text

of its own laws, many of the provisions of the old English sta-
tutes, which had previously been, by adoption, a part of its
jurisprudence. Such a course of proceeding would be con-
sistent and intelligible, and in harmony with a design to re-
peal all the English statutes which were not revised and
re-enacted; but it would be unintelligible and inconsistent
with a design to retain them all as a part of its own common
law.

We think, then, that the statute of William III. constituted
no part of the law of New York at the time when the present
descent was cast; and that the case must rest for its decision
exclusively upon the principles of the common law. The
residue of this opinion will, therefore, be exclusively con-
fined to the consideration of the common law applicable to it.

In order to clear the way for a more exact consideration
of the subject, it may be proper to take notice of some few
distinctions in regard to descents, which are of frequent oc-
currence in the authorities. Descents are, as is well known,
of two sorts; lineal, as from father or grandfather to son or
grandson, and collateral as from brother to brother, and cousin
to cousin, &c. They are also distinguished into mediate and
immediate descents. But, here, the terms are susceptible of
different interpretations; which circumstance has introduced
some confusion into legal discussions, since different judges
have used them in different senses. A descent may be said to
be mediate or immediate, in regard to the mediate or imme-
diate descent of the *estate* or *right;* or it may be said to be
mediate or immediate, in regard to the mediateness or imme-
diateness of the *pedigree,* or *degrees of consanguinity.*
Thus, a descent from the grandfather, who dies in possession,
to the grandchild (the father being then dead); or from the uncle
to the nephew (the brother being dead), is in the former sense
in law an immediate descent, although the one is collateral and
the other lineal, for the heir is in the *per*, and not in the *per*
and *cui.* And this, in the opinion of Lord Chief Justice Bridg-
man, Collingwood v. Pace, Bannister's Rep. of Sir O. Bridg-
man, 410, 418, is the true meaning and appreciation of the terms.
So they are used by Lord Coke in his first Institute, Co. Litt.
10, b. On the other hand, with reference to the line of pedi-
gree or consanguinity, a descent is often said to be immediate,

when the ancestor, from whom the party derives his blood, is immediate, and without any intervening link or degrees, and mediate when the kindred is derived from him *mediante altero,* another ancestor intervening between them. Thus, a descent in lineals from father to son is, in this sense, immediate; but a descent from grandfather to grandson (the father being dead), or from uncle to nephew (the brother being dead), is deemed mediate; the father and the brother being in these latter cases the *medium deferens,* as it is called, of the descent or consanguinity. And this is the sense in which Lord Hale uses the words, assigning as a reason, that he calls it a mediate descent, because the father or brother is the medium, through or by whom the son or nephew derives his title to the grandfather or uncle. Collingwood v. Pace, 1 Vent. 413, 415. S. C. 1 Keble, 671. And in this sense the words are equivalent to mediate and immediate ancestors. In the great case of Collingwood v. Pace, upon which we shall hereafter comment at large, these distinctions were insisted on by the learned judges already referred to with much particularity; and they will help us to understand the reasoning of the court with more readiness and accuracy. We shall constantly use the words in the sense adopted by Lord Hale.

That an alien has no inheritable blood, and can neither take land himself by descent, nor transmit land from himself to others by descent, is common learning, and requires no reasoning to support it. If we were to trust to the doctrines promulgated by elementary writers, it is no less true that alienage in any mediate ancestor will interrupt the descent between persons who are capable of taking and transmitting land by descent. It is so laid down in Comyn's Digest (Alien C. 1.), a work of rare excellence and accuracy; and in Bacon's Abridgement (Alien, C.): and it is implied in the text of Blackstone's Commentaries (2 Black. Comm. 250), where the only exception admitted is of a descent from brother to brother. Lord Coke, in his First Institute, Co. Litt. 8, a, says, that "if an alien cometh into England and hath issue two sons, these two sons are *indigenæ,* subjects born, because they are born within the realm: and yet if one of them purchase lands in fee and dieth without issue, his brother shall not be his heir, for there was never any inheritable blood between the father and them; and

where the sons, by no possibility, can be heirs to the father, the one of them shall be not heir to the other." The case put by Lord Coke of a descent from brother to brother afterwards became an exceedingly vexed question, and was finally resolved in the case of Collingwood v. Pace in favour of the descent from brother to brother by seven judges against three, on deliberate argument before all the judges in the exchequer chamber upon an adjournment of the cause from the common pleas. All the judges gave seriatim opinions; but the whole case turned upon the point, whether the descent was to be considered as mediate or immediate. Three judges (Lord Chief Justice Bridgman, and Tyrrel, J. and Keeling, J.) were of opinion that the descent from brother to brother was not immediate, but mediate through the father (mediante patre); the other judges were of opinion that by the common law the descent from brother to brother was immediate, and not through the father, as a medium deferens. The case is reported in various books, and in all of them, considering its magnitude and importance, in a very imperfect and unsatisfactory manner. The original arguments and opinions in the common pleas are given in 1 Keble's Reports, 65; and in the exchequer chamber in 1 Keble, 174, et seq. 216, 265, 538, 579, 585, 603, 670, 699, in 2 Siderfin's Rep. 193, and very briefly in 1 Levin's Rep. 59, S. C. Hard. Rep. 224. The opinion of Lord Hale is reported at large in 1 Ventris's Rep. 413; and Mr Bannister, in his excellent edition of the judgments of Lord Chief Justice Bridgman (Bannister's Rep. 410, 414), has, recently, and for the first time, given us the opinion of this eminent judge from his own manuscript. It is a most luminous and profound argument, and contains a large survey of the whole doctrine of alienage. In this opinion the special verdict is set forth, and thus gets us rid of some of the obscurities thrown upon it in the former reports. The substance of the facts is as follows: Robert Ramsay, an alien, born in Scotland before the accession of the crown of England to king James, had issue four sons, aliens; viz. Robert, Nicholas, John, afterwards earl of Itchderness, and naturalized by an act of parliament in 1 Jac. I. and George, naturalized by an act of parliament, 7 Jac. I. who afterwards had issue John, the plaintiff's lessor, born in England. Nicholas had issue Patrick, born in England in

1618, who had issue William, born in England, who was then living. John, the earl, having purchased the rectory of Kingston in question in the case, died seised thereof, without issue, in January, 1 Car. I. (1625). Afterwards, in July 1636, George died, leaving issue the said John, the lessor of the plaintiff; afterwards, in May 1638, Nicholas died, leaving the said Patrick his only son living. It did not appear when Robert the eldest son died; but he left three daughters, all aliens born, then living. The question was, whether John, the lessor of the plaintiff, the son of George, would take the premises as heir by descent to the earl, his uncle; or for want of an heir the rectory should escheat to the crown. In the argument of the case by the judges, we are informed, both by Lord Hale and Lord Bridgman, that three things were agreed to as unquestionable by all of them. 1. That neither the daughters of Robert, the son of Robert, being aliens, nor Patrick, the son of Nicholas, though born in England, can inherit, *because his father, through whom he must convey his pedigree, was an alien.* 2. That as the estate cannot descend to them, so neither do any of them stand in the way to hinder the descent to George. The difference hath been often put between the case of a son or brother, aliens, who are in law as non-existentes, and the brother or son of a person attainted, as to this point. 3. That there is no difference between the descent to George and the descent to John his son, the lessor of the plaintiff, who, jure representationis, is the same with the father. If George, having survived John, the earl, might have inherited the estate, so will John, the son, who represents him. So that the point of the case came to this, whether, if two brothers of alien parents, one naturalized by acts of parliament, and the one purchaseth lands and dies; the lands shall descend to the other. And so it is put by Lord Bridgman and Lord Hale.

In regard to Patrick, the son of Nicholas, it is material to observe, that as Nicholas survived John, the earl, he would, except for his being an alien, have been capable to inherit the latter. But, being alive, he would intercept the descent to Patrick, who was a native born subject, according to the principles of the common law stated by this court in M'Henry v. Somerville, 9 Wheat. Rep. 354. The learned judges, however, in Collingwood v. Pace, take no particular notice of the

[Lessee of Levy et al. v. M'Cartee.]

fact that Nicholas was iving at the death of John, the earl; but treat the case exactly in the same manner as if he had been then dead; and apparently rely on no distinction as arising from that fact.   But George, the brother of John, the earl, survived him, and being a naturalized subject, was capable of taking by descent from him, unless the alienage of his father Robert (whether dead or living) interrupted the descent: and John, the lessor of the plaintiff, jure representationis, derived his title directly from his father.

Having stated these preliminaries, which are necessary for a more clear understanding of the case, it may be added, that the case furnishes conclusive evidence, that by the common law, in all cases of mediate descents, if any mediate ancestor through whom the party makes his pedigree, as heir, is an alien, that is a bar to his title as heir, for the reasons stated by Lord Coke, that such an alien ancestor can communicate no inheritable blood.   This was admitted by all the judges, as well by those who were in favour of the lessor of the plaintiff, as by those who argued the other way.   It was necessarily the doctrine of the latter, for they held the alienage of the father a good bar to the descent, deeming a descent from brother to-brother to be a mediate descent only, mediante patre: on the other hand, the seven judges who were for the lessor of the plaintiff, admitted the general doctrine, but contended that it did not apply to the case of a descent from brother to brother, because it was an immediate descent.   And this constituted the whole controversy between them; that is, whether the descent was mediate or immediate.   It will be our business to demonstrate this by passages from the opinions of Lord Bridgman and Lord Hale, who took opposite sides in the argument. Their opinions are given at large, and in an authentic form: those of the other judges, who agreed with them respectively, are given by the reporters in a very abridged and loose manner: but all of them manifestly assume the same general basis of reasoning on this point, as will appear by referring to their opinions in 2 Siderfin's Rep. 193, and 1 Keble's Rep. 579, 585, 603, 670, 699.

In the first place we will begin with Lord Hale.   He says, " in immediate descents, there can be no impediment but what arises in the parties themselves.   For instance, the father

seised of lands, the impediment that hinders the descent must be either in the father or the son; as if the father or the son be attaint or an alien. In mediate" (printed immediate by mistake as the context shows) "descents, a disability of being an alien, or attaint in him, that I call a medius ancestor, will disable a person to take by descent, though he himself hath no such disability. For instance in lineal descents; if a father be attaint or be an alien, and hath issue a denizen born, and dies in the life of the grandfather, the grandfather dies seised; the son shall not take, but the land shall escheat. In collateral descents, A. and B. brothers; A. is an alien or attainted, and hath issue to a denizen *born*;* B. purchaseth lands and dies without issue, C. shall not inherit; for A., which was the médius ancestor, or medium deferens of this descent, was incapable. And this is very apparent in this very case; for by this means Patrick, though a denizen born, and the son of an elder brother, is disabled to inherit the earl. A. and B. brothers; A. is an alien or person attainted, and hath issue C. and dies, and C. purchaseth lands and dies without issue; B., his uncle, shall not inherit for the reason beforegoing; for A. is a medius, which was disabled. And if in our case Patrick, the son of Nicholas, although a denizen born, had purchased lands and died without issue, John, his uncle, should not have inherited him, by reason of the disability of Nicholas; and yet Nicholas himself, had he not been an alien, could not immediately have inherited to his son, but yet he is a block in the way of John." Collingwood v. Pace, 1 Vent. 415, 416; S. P. Id. 419, 423. See also S. C. 1 Keble, 671, &c. These passages distinctly establish the doctrine contended for in all cases of *mediate* descents in the sense given to these terms by Lord Hale: that is, that an alien mediate ancestor through whom the party must claim, is a bar to the descent. The cases put of a descent from grandfather to grandson, the father being an alien and dead; and of a descent from an uncle to a nephew, the brother being an alien and dead; are direct to the point, and are put as unquestionable. Lord Hale also cites in illustration

* The word " denizen" is used in the common law in a double sense. It sometimes means a natural born subject; and sometimes a person who, being an alien, has been denizenized by letters patent of the crown. Co. Litt. 129, a. Id. 8 a. Com. Dig. Alien, D. Bannister's Rep. 433.

of this doctrine, Grey's case, Dyer's Rep. 274, and Courtney's case, cited 1 Vent. 425, Bannister's Rep. 452. Both of these were cases of attaint in the mediate ancestor creating an incapacity to inherit; and although in some cases there is a difference between alienage and attaint, where the claim is not through the ancestor, yet where the claim is through him there is no difference. The disability equally applies to each, and breaks the inheritance. Lord Hale takes notice of this distinction in another part of his argument, in speaking of the disability of an alien, which is general or original to himself in reference to inheritance; and where it is a consequential or consecutive disability, that reflects to an alien from one that must derive by or through him, though he perchance be a natural born subject. Thus he says, "in respect to this incapacity (personal), he doth resemble a personal attaint; yet with this difference. The law looks upon a person attaint as one that it takes notice of; and therefore the eldest son attaint, over-living his father, though he shall not take by descent in respect of his disability, yet he shall hinder the descent of the younger son. But if the eldest son be an alien, the law takes no notice of him; and therefore, as he shall not take by descent, so he shall not impede the descent to his younger brother. A consequential consecutive disability, that reflects to an alien from one that must derive by or through him, though he perchance be a natural born subject (doth impede).* As in our case, though Patrick the son of Nicholas be a natural born subject, yet because Nicholas his father was an alien, there is a consecutive impediment derived upon Patrick, whereby he is consequentially disabled to inherit John his uncle: and this consecutive disability is parallel to that which we call corruption of blood, which is a consequent of attainder. If the father be attainted, the blood of the grandfather is not corrupted; no, nor the blood of his son; though he could not inherit him, but only the blood of the father. But that corruption of blood in the father draws a consequential impediment upon the son to inherit the grandfather; because the father's corruption of blood obstructs the transmission of the hereditary descent between the grandfather and the son." 1 Vent. 417, 418.

* These words are not found in Vent. 417; but the immediate context shows that they are omitted by mistake, and the sentence is left imperfect.

[Lessee of Levy et al. v. M'Cartee.]

Lord Hale afterwards proceeds to state the reasons why, notwithstanding the general rule, he was of opinion that in the case at bar, George, and by parity of reasoning, his son John, the lessor of the plaintiff, could inherit to the earl. "My first reason," says he, "is because the descent from brother to brother, though it be a collateral descent, yet it is an immediate descent; and consequently, upon what has been premised at first, unless we can find a disability or impediment in them, no impediment in another ancestor will hinder the descent between them." 1 Vent. Rep. 423. He then proceeds to establish his doctrine, that it is an immediate descent, and that in this respect it differs from all other collateral descents whatsoever. He then adds, "if the father, in case of a descent between brothers, were such an ancestor as the law looks upon as a medium that derives the one descent from the other, then the attainder of the father would hinder the descent between the brothers. But the attainder of the father doth not hinder the descent between the brothers: therefore the father is not such a medium or nexus as is looked upon by law as the means deriving such descent between the two brothers." 1 Vent. Rep. 425.

These passages from Lord Hale's opinion have been cited the more at large because they afford a satisfactory answer to the argument at the bar, as to the incongruity and inconclusiveness of his reasoning; and establish beyond controversy, that in his opinion the common law interrupted the descent wherever a mediate ancestor was either an alien or attaint; and that the case of a descent from brother to brother was excepted because the descent was immediate.

Let us now proceed in the next place to the opinion of Lord Bridgman. He begins by stating the very same proposition as lord Hale. "It hath been inferred," says he, "that in immediate descents there can be no impediment but what ariseth in the parties themselves. But in mediate descents, *it is agreed*, the disability of being an alien, or attainted in him that is the medius antecessor, will disable the other, though he have no such disability. And therefore Patrick here, though born in England, cannot inherit John his uncle, nor John to him, by reason of the disability of Nicholas, the medius antecessor. But it is said that the descent from brother to brother,

though it be a collateral descent, yet it is an immediate descent, and so no impediment could hinder a descent between them. Bannister's Rep. 418, 436. And the whole of his argument is then employed in an attempt to disprove that the descent between brothers is by the common law immediate, and in affirming the doctrine of Lord Coke in Co. Litt. 8 a. for the same reason, viz. there is no inheritable blood between them, otherwise than mediante patre. Bannister's Rep. 437, 442, 443, 445, 460. It is unnecessary to go over that reasoning, because it proceeds upon the ground as conceded and clearly established in the common law, there can be no title made by descent, where there is a mediate alien ancestor, unless it be the case of a descent from brother to brother.

The case of Collingwood v. Pace, then, does conclusively establish the doctrine of the common law to be, by the admission of all the judges, that if the pedigree must be traced through a mediate alien ancestor, the party cannot take by descent, for the inheritable blood is stopped, and there is a flat bar to the assertion of any title derived through the alien; so that the elementary writers are fully borne out in their assertions on this subject. See Com. Dig. Alien, C. Bac. Abridg. Alien, C. Cruise's Dig. tit. 29, chap. 2, sect. 20. York on Forfeiture, 72. 3 Salk. 129. Doe d. Durorere v. Jones, 4 Term Rep. 300.

The preamble to the statute of 11 and 12 William III. ch. 6, also affords strong evidence of the antecedent state of the law on this point; and that the statute is remedial; and not, as has been argued at the bar, in any respect declaratory. It is in the following words: " whereas divers persons born within the king's dominions are disabled to inherit, and make their titles by descent from their ancestors, by reason that their father or mother, or some other ancestor by whom they are to derive their descent, was an alien, and not born within the king's dominions, for remedy whereof," &c.

Here, the disability to inherit and make title is plainly stated to exist; not that there is a doubt upon the subject; and the disability is stated to arise from the fact, that the ancestor *by* whom they are to derive their *descent* is an alien; not that the ancestor from whom they derive their title to the *estate* is an alien; and a remedy is therefore provided to meet that which

[Lessee of Levy et al. v. M'Cartee.]

was deemed the only inconvenience, a descent through a mediate alien ancestor.

Upon the clear result, then, of the English authorities, we should be of opinion, even if there were no further lights on the subject, that the alienage of the mediate ancestors in the present case, would be a bar to the recovery of the plaintiff. But the same doctrine will be found fully recognized by Mr Chancellor Kent in his learned Commentaries, with the additional declaration, that the statute of William III. had never been adopted in New York; though he very properly admits that the enlarged policy of the present day would naturally incline us to a benignant interpretation of the law of descents, in favour of natural born citizens; who were obliged to deduce a title to land from a pure and legitimate source, through an alien ancestor. 2 Kent's Comm. 47, 48, 49. See also Jackson v. Lunn, 3 John. Cas. 109, 121. The case of Jackson v. Wood, 7 Johns. Rep. 289, 297, has not the slightest bearing on the subject. It decided no more than that an Indian was incapable of passing a title to lands in New York, without the consent of the legislature; or in any other manner than is provided for by the laws of the state. The case of Jackson v. Jackson, 7 Johns. Rep. 213, turned upon the known distinction, that an alien who cannot inherit, shall not prevent the descent to a citizen, who can make title as heir, not through the alien, but aside from him; as in the common case in England, of a younger brother inheriting from his father, though he has an elder brother living, who is an alien.

But there is a very recent decision in the state of New York, not yet in print, which is direct to the point now before us. It is the case of Jackson v. Green, decided by the supreme court of that state in 1831. We have been favoured with a manuscript copy of the opinion delivered by the court on that occasion. The question in that case was, whether one naturalized citizen could take by descent from another naturalized citizen, who was his cousin; the pedigree being to be made through alien ancestors. It was held that he could not. The court fully recognized the distinction already adverted to between mediate and immediate descents; holding that an alien ancestor, through whom the pedigree must be traced, intercepted the descent, and produced a fatal bar to the recovery.

[Lessee of Levy et al. v. M'Cartee.]

A certificate will be sent to the circuit court, that the lessors of the plaintiff, Bella Cohen and Rhina Mordecai, were not capable of taking by descent the premises described in the special verdict in the case, whereof the said Philip Jacobs died seised, as therein stated, as heirs at law of the said Philip Jacobs; by reason of the alienage of the mother of the said Philip Jacobs, and his maternal uncle, Leipman Cohen, and their father: the lessors of the plaintiff deriving their pedigree and title by descent through mediate alien ancestors.* Certificate accordingly.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the southern district of New York, and on the point and question on which the judges of the said circuit court were opposed in opinion, and which was certified to this Court for its opinion agreeably to the act of congress in such cases made and provided, and was argued by counsel; on consideration whereof, it is the opinion of this Court, that the lessors of the plaintiff, Bella Cohen, and Rhina Mordecai, were not capable of taking by descent the premises described in the special verdict in the case, whereof the said Philip Jacobs died seised, as therein stated, as heirs at law of the said Philip Jacobs, by reason of the alienage of the mother of the said Philip Jacobs and his maternal uncle, Leipman Cohen, and his father; the lessors of the plaintiff deriving their pedigree and title by descent through mediate alien ancestors. Whereupon it is ordered and adjudged by this Court, that it be certified to the judges of the said circuit court that the lessors of the plaintiff, Bella Cohen and Rhina Mordecai, were not capable of taking by descent

* *Note.* It may not be useless to state, that the title of the parties in Collingwood v. Pace underwent judicial examination and decision, at three different periods. The first was in Foster v. Ramsay in the upper bench, during the commonwealth, 1657—1659, and is reported in 1 Siderfin's Rep. 28, 51, 148, and cited in Bannister's Rep. 447. The second was Collingwood v. Pace, brought in 1656, but not finally decided until many years afterwards. The third was Crane v. Ramsay, in 21 and 22 Car. II. (1670), reported in 2 Vent. R. 1; Vaughan's Rep. 274; Thomas Jones's Rep. 10; Carter's Rep. 188. In the two first cases, John, the son of George, was lessor of the plaintiff. In the last, the lessors of the plaintiff claimed by grant from Patrick, the son of Nicholas, and John was defendant.

[Lessee of Levy et al. v. M'Cartee.]

the premises described in the special verdict in the case, whereof the said Philip Jacobs died seised, as therein stated, as heirs at law of the said Philip Jacobs, by reason of the alienage of the mother of the said Philip Jacobs, and his maternal uncle, Leipman Cohen, and their father; the lessors of the plaintiff deriving their pedigree and title by descent through mediate alien ancestors.