Turnmire v. Mayes.

JAMES TURNMIRE *v.* J. A. MAYES, Exr., *et al.**

(*Knoxville.* September Term, 1908.)

1. **BASTARDS.** Status at common law; incapacity to inherit; no heirs, save those of their own bodies.

Under the common law, an illegitimate child was treated as *nullius filius*, and, as such, incapable of inheriting from either the putative father or the mother, and without heirs, save those of his own body. (*Post, p.* 49.)

2. **SAME.** Statute relating to inheritance by and from illegitimate children was repealed by its omission from the Code.

The statute (Acts 1819, ch. 13, sec. 1) enabling the illegitimate child or children to inherit from the mother dying intestate and leaving no legitimate child or children; and enabling the legitimate and illegitimate brothers and sisters born of the same mother to inherit equally the estate of a deceased illegitimate brother or sister dying intestate and without issue, but not enabling the illegitimate brothers and sisters to participate with the legitimate brothers and sisters born of the same mother in the inheritance of a legitimate brother or sister dying intestate and without issue, was repealed by its omission from the Code of 1858. (*Post, pp.* 49-53.)

Acts cited and construed: Acts 1819, ch. 13, sec. 1.

Cases cited and approved: Riley v. Byrd, 3 Head, 19; Woodward v. Duncan, 1 Cold., 562; Kelly v. Jackson, 2 Shannon's Cases, 198; Dennis v. Dennis, 105 Tenn., 86.

3. **SAME.** Same. Statute to supply the place and correct the inequalities of the former statute.

Section 10 of the Acts 1866-67, ch. 36, was evidently passed to supply the place and correct the inequalities growing out of the construction of Acts 1819, ch. 13, sec. 1, as shown in the foregoing headnote. (*Post, p.* 53.)

* As to inheritance by, through, or from illegitimate persons, see note to Croon v. Phelps (Ky.), 23 L. R. A., 753.

Acts cited and construed: Acts 1819, ch. 13, sec. 1; Acts 1866-67, ch. 36, sec. 10.

Case cited and approved: Laughlin v. Johnson, 102 Tenn., 455.

4. **SAME.** Statute affecting the status and inheritance by and between illegitimates is prospective and not retrospective.

The statute (Acts 1866-67, ch. 36, sec. 10) enabling the illegitimate child or children of a mother dying intestate to inherit her estate equally with her legitimate child or children, and enabling the brothers and sisters of either of such children dying intestate and without child to take in like manner his or her estate, is prospective in its character and operation, and therefore did not affect the status or capacity of inheritance of such a child who died before the passage of the statute. (*Post, pp.* 53, 54, 57-61.)

Acts cited and construed: Acts 1866-67, ch. 36, sec. 10.

Cases cited and approved: Leach v. Cooper, Cooke, 249; Starks v. Trainor, 11 Hum., 292; Puckett v. State, 1 Sneed, 356; Riley v. Byrd, 3 Head, 19; Woodward v. Duncan, 1 Cold., 562; Edwards v. Goulding, 38 Miss., 118; Steckel's Appeal, 64 Pa., 494; Curtis v. Hewins, 11 Metc., 294; Carroll v. Carroll, 20 Texas, 746.

5. **SAME.** Illegitimate mother's legitimate child inherits through her, if at all, and not directly from her legitimate brother and sister.

If a legitimate child of an illegitimate mother can inherit from the mother's legitimate brother and sister, he must do so through his mother, and not directly from his such uncle and aunt. ·(*Post, pp.* 53, 54, 62, 63.)

Case cited and approved: Dennis v. Dennis, 105 Tenn., 86.

6. **SAME.** Illegitimate deceased mother's legitimate child will not inherit from her legitimate brother or sister dying intestate without children but leaving legitimate brothers.

Under the provisions of the statute as stated in the fourth headnote, the legitimate child of an illegitimate mother dying be-

Turnmire v. Mayes.

fore the passage of the statute does not inherit from the mother's legitimate intestate brother or sister who died after the passage of the act leaving surviving legitimate brothers, but no children. (*Post, pp.* 48-63.)

Acts cited and construed: Acts 1866-67, ch. 36, sec. 10.

Cases cited and approved: Levy v. McCartee, 6 Pet., 102.

Cases cited and distinguished or disapproved: Dennis v. Dennis, 105 Tenn., 86; Sleigh v. Strider, 5 Call (Va.), 439; Rice v. Efford, 3 Hen. & M. (Va.), 225; Ash v. Way, 2 Grat. (Va.), 204; Bale v. Elder, 118 Ill., 436; Sutton v. Sutton, 87 Ky., 216; Dickenson's Appeal, 42 Conn., 491.

7. **SAME.** Legislation for relief of illegitimates and their offspring favored, but not extended beyond its provisions.

While the courts regard with favor the legislation for the relief of illegitimates and their offspring, and, so far as found consistent with sound rules of construction, will administer it with a view of effectuating its humane purpose, yet they will not go further in the recognition of inheritable blood in illegitimates than the legislature has unmistakably gone. (*Post, p.* 63.)

Case cited and approved: Laughlin v. Johnson, 102 Tenn., 455.

FROM HANCOCK.

Appeal from the Chancery Court of Hancock County. —HUGH G. KYLE, Chancellor.

HOLLOWAY & DONALDSON and R. C. COLEMAN, for complainant.

HUGHES, GREENE & HUGHES, COLEMAN & HORTON and W. T. COLEMAN, for defendants.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

The complainant, the legitimate son of an illegitimate mother who died in 1854, a resident of this State, files the present bill, in which he asserts his right to be let in to a share of the estates, real and personal, of a sister and brother of the same mother, both of whom were legitimate, and who died, respectively, in 1901 and 1903, intestate, leaving neither mother nor father nor issue surviving. The facts as to the claim thus presented are: That Elizabeth McCoy, before her marriage to Ewel Jordan, gave birth to an illegitimate daughter, Mahala Jordan. After their marriage there were born to Elizabeth and her husband, Ewel, three children, Aurena, Thomas, and James Jordan. The illegitimate, Mahala, afterwards married one Turnmire, and the fruit of this marriage was the complainant and a daughter, who subsequently died leaving surviving a legitimate child. Upon these facts, the question is: Did the complainant, the issue of the predeceased illegitimate, inherit from his ancestor's legitimate half-sister along with the surviving legitimate brothers, and did he inherit from his ancestor's legitimate half-brother along with the surviving legitimate brothers?

The insistence of complainant is that the issue of the illegitimate half-sister inherited, along with the surviving legitimate brothers, a share in the estate of the deceased legitimate half-sister, who died in 1901, and

also inherited with the surviving legitimate brother a share in the estate of Thomas Jordan who died in 1903. The chancellor decreed in accordance with this insistence. Whether this holding is sound depends upon a proper construction and application of chapter 36, sec. 10, p. 57, of the Acts of 1866-67, which will be hereinafter set out; but before doing this, it is necessary to notice the legislation preceding that act, fixing the inheritable status of the issue of illegitimates and the holding of the court in regard thereto. The first of these acts is that of 1819 (Acts 1819, p. 472, c. 13), section 1 of which reads as follows:

"When any woman shall die intestate leaving natural born child or children and no legitimate child or children, such natural born child or children shall take by the general rules of descent and distribution the estate, real and personal, of his, her, or their mother, and shall either of such children die intestate, without children, his or her brothers and sisters shall in like manner take his or her estate." Nicholson & Caruthers, 250.

This was a great modification of the rigor of the common law, which treated the unfortunate illegitimate as *nullius filius,* and, as such, incapable of inheriting from either the putative father, or the mother, and without heirs, save those of his own body. Still the language of the statute confined the relief granted to the natural born child, or children, of the mother, who died intestate without legitimate child, or chil-

121 Tenn—4

Turnmire v. Mayes.

dren, and to the surviving brothers and sisters of such children as might die intestate and childless.

In *Riley* v. *Byrd,* 3 Head, 19, however, the concluding clause of this act was held to embrace a case where the mother died leaving both legitimate and illegitimate children. There the facts were that an illegitimate son died in 1847, or 1848, without children, or other descendants, but leaving surviving half-brothers and sisters, born to the same mother in lawful wedlock, and the question presented was whether these survivors took by inheritance the real estate of the deceased illegitimate. The trial judge, in his charge to the jury, in construing section 1, c. 13, p. 472, of the Acts of 1819, confined the change of the common law, affected by it, to illegitimate brothers and sisters, to the exclusion of legitimates; that is, he told them that the statute made the brothers and sisters of the deceased illegitimate his heirs, if they were also illegitimate, but that it continued the common-law exclusion if they were legitimate. In the opinion of the court, while recognizing the first clause of the act as being operative only where a woman died intestate, leaving a natural born child, or children, and no legitimate child or children, it was held that the concluding clause of the statute had a broader scope, and under it the legitimate half-sisters and brothers were let in to share the estate of the illegitimate born of the same mother.

Thus it will be seen that the utmost scope of the opinion and of the judgment in the case was that the legitimate and illegitimate brothers and sisters, born of the same mother as that of the predeceased illegitimate, would share equally in the estate. So we think it clearly appears that, even if the act of 1819 was still in existence, that case would furnish no support to the present contention of complainant, which is one where the child of the illegitimate mother is seeking inheritance in the estate of the deceased sister and brother of that mother, both of whom were legitimate.

That a proper construction of that act excluded such a case as that presented in this record is made clear by reference to *Woodward* v. *Duncan*, 1 Cold., 562. The controversy there was as to who should take the real and personal estate of one David Herring, who died intestate, unmarried, and leaving both real and personal estate—whether the full sisters of the deceased to the exclusion of two illegitimate sisters, children of the same mother, or whether the illegitimates should share equally with the legitimates in the estate. The opinion in that case was delivered by the same member of the court who delivered that in *Riley* v. *Byrd*, supra. After referring to section 2423 of the Code of 1858, which has no bearing upon the present case, the court said: "In *Riley* v. *Byrd*, 3 Head, 20, we held that the lawful issue of the same mother took equally with the unlawful brothers and sisters of the illegiti-

mate deceased intestate. Now, it will be seen that these statutes apply alone to the case of an illegitimate decedent, and only changed the existing law of descents and distributions in relation to their estates; but this is the case of a legitimate's estate. The common law must prevail as to that, as there has been no change by any statute. We are not disposed to go beyond the legislature in removing . . . the stigma from bastardy. The cause of good morals forbids it." The result was that the illegitimate half-sisters were excluded from the inheritance.

Thus, it will be seen that while, under the authority of *Riley* v. *Byrd*, supra, legitimate half-brothers and sisters were let in with the illegitimates, of the same class, to enjoy the estate of a deceased illegitimate child of the same mother, who died intestate and without issue, under the authority of *Woodward* v. *Duncan*, illegitimate brothers and sisters could not participate with the legitimate brothers and sisters of the whole blood in the estate of a legitimate brother. This latter construction would have excluded the complainant's mother, even if her half-sister Aurena, and her half-brother Thomas, had predeceased her, from sharing in their estates, and, *a fortiori*, the complainant, the son of that mother, would be excluded.

We have omitted reference to chapter 39, p. 43, of the Session Acts of 1851-52, carried in substance into Code of 1858, sec. 2423 (Shannon's Code, sec. 4166), be-

Turnmire v. Mayes.

cause, while dealing with illegitimates, yet it is not claimed that it has any bearing on the present case.

Save for this last-mentioned act, chapter 13, p. 472, of the Acts of 1819, stood alone in conferring inheritable blood upon illegitimates, though, as has been seen, only to a limited degree.   This act, not having been carried into the Code, was therefore repealed (*Kelly* v. *Jackson,* 2 Shan. Cas., 198; *Dennis* v. *Dennis,* 105 Tenn., 86, 58 S. W., 284), and no further legislation on this subject occurred until the passage of chapter 36, p. 56, of the Acts of 1866-67.   Section 10 of that statute was evidently passed to supply the place and correct the inequalities growing out of the construction of the Act of 1819. *Laughlin* v. *Johnson,* 102 Tenn., 455, 52 S. W., 816.   This section is as follows:

"Be it further enacted, that, where any woman shall die intestate, leaving a natural born child, or children, whether she also leave a legitimate child, or children, or otherwise, such natural born child, or children, shall take by the general rules of descent and distribution equally with the other child, or children, the estate, real and personal, of his, her, and their mother, and should either of such children die intestate, without child, his or her brothers and sisters shall in like manner take his or her estate."

That this statute is prospective in character its phraseology places beyond question.   It was in existence at the time of the deaths of Aurena and Thomas Jordan, and upon it (supplemented by the general stat-

utes of descents and distribution) the complainant rests his right to be let in to a share of the estates of this aunt and uncle. The insistence is that his claim is well within the concluding clause of the section, which is: "Should either of such children die intestate, without child, his, or her, brothers and sisters shall in like manner take his, or her, estate."

In the first place, it will be observed that complainant is not within the literalism of this clause, because he is not the brother, but the nephew, of these deceased parties. Conceding, however, that he is within its spirit, succeeding to whatever right, if any, his mother had (as is the holding of *Dennis* v. *Dennis,* 105 Tenn., 86, 58 S. W., 284), the question then necessarily arises: What right did his mother have? That the complainant does not take direct from his aunt and uncle, but, if at all, through his mother, is, we think, well established by authority. That this is so is recognized in *Dennis* v. *Dennis,* supra. The mother of complainant died in 1854, about twelve years before the passage of the act in question, and only a little short of fifty years before the death of her half-sister, Aurena; and half-brother, Thomas. Had she been a legitimate sister of these parties, under the general statute of descents and distribution, the complainant, as one of her children, would unquestionably be let in to a share of their respective estates, and the argument is that, she having died during the life of Aurena and Thomas, the complainant takes by representation the place of his il-

legitimate mother, according to the provision of the statute, which is that if any brother or sister of the whole or half blood "should die in the intestate's life-time, leaving issue, such issue shall represent the deceased parent. . . ." This provision, however, necessarily, is predicated upon the essential fact that the deceased sister or brother, to whose share the issue thus succeeds, had, at her or his death, inheritable blood, which would have enabled her or him to take. Lacking this, the rule of representation could not apply, and the issue would be disappointed of the inheritance. We think there is no escape from the premise that the issue must take through a person who died capable of inheriting. If the party through whom the succession is sought lacked inheritable blood, the one seeking the succession is absolutely prescribed.    Nowhere is this view more strongly stated than in the very learned opinion of Story, J., in *Lessee of Levy* v. *McCartee,* 6 Pet., 102, 8 L. Ed., 334.    That was an ejectment suit, in which the citizens of South Carolina sought to recover, as heirs of an ancestor, lands lying in the State of New York.    In making out their title they had to deraign through an alien, and it was held though citizens of the United States, yet their suit must fail because of the alienage of the party through whom they must claim. As to this the court said: "That an alien has no inheritable blood, and can neither take land himself, by descent, or transmit land from himself to others by descent, is common learning.    If we were to trust to

the doctrines promulgated by elementary writers, it is no less true that alienage in any immediate ancestor will interrupt the descent between persons who are capable of taking and transmitting land by descent. . . ." Lord Coke, in his first Institute, says, that: "If an alien cometh into England and hath issue two sons, these two sons are *indigenae,* subjects born, because they are within the realm; and yet, if one of them purchased lands in fee and dieth without issue, his brother shall not be his heir, for there was never inheritable blood between the father and them, one of them shall not be heir to the other."

The principle announced with regard to alienage goes beyond our statute with regard to the inheritable properties of an illegitimate, for, in such case, as has been seen, not only can an illegitimate inherit from his mother, but, in proper contingencies, from his brothers and sisters; but the case is authority of great weight upon the point that where the person, through whom an inheritance is claimed, lacks inheritable blood, the party so claiming, as a matter of law, will be disappointed of the inheritance.

That the illegitimate mother of complainant had no right of inheritance at the time of her death is clearly settled in *Woodward* v. *Duncan,* supra. As to her, with relation to this half-sister and half-brother and their estates, she was as if an alien in blood. The common law was in force so far as she was concerned, as to them and their estates. This being so, it would be dif-

ficult to find a principle of law upon which it can be maintained that this statute, conferring an inheritable quality upon a class of persons not possessing it before its passage, can be held to confer it upon an individual of that class, who died before its enactment, who is, as to the acquisition of any right, as though he or she had never existed.

It is suggested, however, that the fact that Elizabeth Jordan, the mother of Mahala, though illegitimate, died several years after the passage of the act of 1866-67, satisfies its prospective feature, and should have a controlling influence in saving the right set up by complainant; but it is not shown that she died "intestate," and, if this had appeared, it could only affect the distribution of whatever estate she might have left, in that, under the first clause of the act, her natural born offspring would take equally with those that were legitimate. By the construction heretofore given to the clause, under which alone the present claim must be maintained, if at all, it is practically independent of what precedes and provides for new conditions. The terms are: "Should either of such childen die intestate, without child, his or her brothers and sisters shall in like manner take his or her estate." As has already been said, the statute is prospective in character and in this clause, as distinctly as in that which goes before, contemplates and makes provision for deaths occurring after its passage, and not before. We place this interpretation upon the act, from its words clearly indicat-

ing that it was intended to operate upon situations arising thereafter, rather than on the generally accepted rule of construction, that a statute should have a prospective operation only, unless its terms distinctly show the legislative intent, that it should have a retrospective effect.

That the inheritable *status* of the mother is fixed by the law as it stood in 1854 we have no doubt. In *Puckett* v. *State,* 1 Sneed, 356, the court had before it a case involving a statute, passed in 1850, conferring the right on widows to inherit realty from their husbands, who had died leaving no heirs at law capable of inheriting real estate, and which expressly provided, in its second section, that: "The provisions of this act shall be extended to and embrace all cases in which persons may have heretofore died intestate, . . . as well as those who hereafter die intestate." In that case the heirs of the widow were claiming certain lands through the widow, on whom the law had conferred the right to inherit. The widow in question had died in 1834, before the passing of the act under which her heirs claimed. With regard to this, the court said: "Admitting the retrospective feature of the second section to be unquestionable, it is very clear that it can apply only in favor of widows who were living at the time of the passage of the act, and that it can have no application in favor of the heirs of the widow, who, as in the present case, died previously."

In *Riley* v. *Byrd,* supra, it was expressly held that the act which was in force at the time of the death of the illegitimate determined the rights of the plaintiffs to a share in his estate, and that subsequent statutes could in no way affect those rights. This principle is in effect recognized in *Starks* v. *Trainor,* 11 Humph., 292, and also in *Leach* v. *Cooper,* Cooke, 249, where it is said the correct rule in ascertaining the heir is to look at the law as it stood when the ancestor died. In the present case the mother of complainant was his ancestor.

This view finds support in a number of adjudged cases of much authority. In *Edwards* v. *Goulding,* 38 Miss., 118, this exact question was passed on. A statute had been passed in 1846 by the legislature of Mississippi, providing for illegitimate children of the same mother inheriting from each other, which was in words as follows:

"Hereafter all illegitimate children shall inherit the property of their mothers and from each other, as children of the half blood, according to the statutes of descents and distribution, now in force in this State."

One Cecilia Reagan, an illegitimate, died in 1852, after the passage of the act of 1846, and she had an illegitimate half-brother, one Josiah Horton, who died before 1846, leaving legitimate children. It was conceded by counsel and the court that had Josiah Horton lived after the act of 1846 was passed, and had been alive at the death of Cecilia Reagan, his illegitimate

half-sister, he would have inherited from her, and the lower court charged the jury that the fact that he died before the passage of the act of 1846 did not affect the matter, and that his legitimate children therefore were entitled to the same rights that he would have had if alive. This charge of the trial judge was assailed in the court of last resort and there held to be erroneous. On this point the court said, among other things, that Josiah Horton, from whom these petitioners must claim, if at all, died before the passage of the act, and long before the death of Cecilia Reagan, his half-sister, and could not therefore have any right of seizin in himself.

In accord with this holding is *Steckel's Appeal*, 64 Pa., 494, *Curtis* v. *Hewins* (Mass.), 11 Metc., 294, and *Carroll* v. *Carroll*, 20 Tex., 746.

But, independent of authority, we think this view must be sound. When did Mrs. Turnmire acquire an interest in the estates of Aurena and Thomas, her sister and brother? As we have seen, she did not have it during life, nor did it accrue to her at her death. Paraphrasing language found in the very exhaustive brief of learned counsel in *Edwards* v. *Goulding*, supra, this is an instance in which it is insisted that a statute, passed to regulate the rights, duties, and capacities of the living, and of those that were to come thereafter, is ample to confer powers and capacities on the dead. We do not think that such an anomaly was contem-

plated by the legislature in the passage of the act of 1866-67, nor do we think it was done.

The counsel of complainant have called to the attention of the court, in their very able argument, many cases, which they insist support their contention and enforce a contrary view to that we have announced. Among these are *Sleigh* v. *Strider,* 5 Call (Va.), 439, *Rice* v. *Efford,* 3 Hen. & M. (Va.), 225, and *Ash* v. *Way's Adm'rs,* 2 Grat. (Va.), 204. It will be found, however, on examination of these cases, that the rule of the civil law, under which the subsequent marriage of the parents legitimatizes their children born out of wedlock, prevails in the State of Virginia, supplemented, alone, by the condition that the parents have recognized the child as their offspring. Upon such marriage, coupled with this recognition, whenever given, the child at once becomes a legitimate, endowed with all the legal capacities of one born in wedlock. It is apparent that cases arising under the rule of the civil law cannot be invoked as authority in a jurisdiction where the common law upon this subject of illegitimacy, save where it is modified by statutes, exists.

Nor can the case of *Bale* v. *Elder,* 118 Ill., 436, 11 N. E., 421, be relied upon for this contention, inasmuch as it involved a construction and application of a section in the statute of descents of Illinois, which is as follows:

"An illegitimate child shall be heir of his mother

and maternal ancestor, and of any person from whom its mother might have inherited if living."

The language of this section fixed beyond doubt all question of the relative *status* of the illegitimate. The difference beween that provision and the act of 1866-67 is so radical that it requires but a glance at the two to discover it.

But it is unnecessary to pursue the discussion further, inasmuch as we hold, as has already been seen, that the *status* of Mrs. Turnmire was fixed by the law in existence at the time of her death. Unquestionably there can be found cases like *Sutton* v. *Sutton,* 87 Ky., 216, 8 S. W., 337, 12 Am. St. Rep., 476, which hold that the bastardy of the mother does not stop the current of inheritable blood; but these, like the Illinois case just referred to, rest upon the peculiar phraseology of a local statute, or else, like *Dickenson's Appeal,* 42 Conn., 491, 19 Am. Rep., 553, upon a common law, as to the taking and transmission of property by illegitimates, prevailing in that State, altogether unlike the common law of England as it is recognized and enforced here, except as changed by statute. Such cases can have little, if any, extraterritorial authority, except when invoked in those States having similar laws, but under our statutes will be held to support the claim of complainant no more than that of *Dennis* v. *Dennis,* supra. In that the illegitimate son was permitted, through his legitimate mother, to take a share in the estate of his deceased legitimate aunt. In the present

case, the effort is to obtain for a legitimate son an interest in the estate of a legitimate aunt and uncle, through a mother who was illegitimate.

While this court has regarded with favor the legislation for the relief of illegitimates and their offspring, and, so far as found consistent with sound rules of construction, has administered it with a view of effectuating its humane purpose, yet, in *Laughlin* v. *Johnson*, 102 Tenn., 455, 52 S. W., 816, it is distinctly said that the court "would not go further in the recognition of inheritable blood in illegitimates than the legislature had unmistakably gone." In the present case, failing to find any statute which authorizes the complainant to reach the inheritance he seeks, his claim must be repelled.

The decree of the chancellor is therefore reversed, and the bill is dismissed.