## Balinski et ux. *v.* Press Publishing Company et al., Appellants.

Argued April 22, 1935.

Before
KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*John H. Sorg,* with him *Thorp, Bostwick, Reed & Armstrong,* for appellants.

*Wilbur F. Gilbraith,* for appellee, filed no brief.

OPINION BY STADTFELD, J., July 18, 1935:

This is a workmen's compensation case. The referee made his findings of facts and an award in favor of claimant. The Workmen's Compensation Board affirmed the award but substituted its own findings of fact and conclusions. The lower court, in an opinion by MUSMANNO, J., dismissed exceptions to the findings of the board, adopted those of the board, and entered

judgment on the award. From that judgment this appeal was taken.

The board made, inter alia, the following findings and conclusions: "1. On October 1, 1932, E. J. Shanahan, hereinafter referred to as the district manager, was in the employ of the Press Publishing Company as route man in charge of the Carrick and Brentwood District in the City of Pittsburgh. He received a weekly wage of $25, and in addition, was furnished with copies of the "Press" at two cents, with instructions to distribute the same to newsboys at $2\frac{1}{4}$ cents, and with further instructions to cause the same to be sold to the public at three cents. He received a profit of $\frac{1}{4}$th cent on all papers so sold, in addition to his stated weekly wage, and was given credit on all papers returned unsold.

"2. The Press Publishing Company gave to the district manager a list of street corners in the district which had been recognized and established for the sale of the "Press," with instructions to place thereon a newsboy to sell the same to the public, who should have more or less exclusive rights to offer the same for sale in the vicinity to which he had been assigned. The Press Publishing Company also furnished money bags on which the word "Press" was printed, as well as shoulder straps for the newsboys; and placed over this and other adjoining districts a supervisor, one McCormick, hereinafter referred to as the supervisor of the district.

"3. On October 1, 1932, the district manager had assigned the intersection of Nobles Lane and Brownsville Road to Peter Wladiplan Balinski, hereinafter referred to as the decedent, who was then six days past fourteen years of age, without first obtaining an employment certificate as required by the Act of May 13, 1915, P. L. 286. He furnished the decedent with copies of the "Press," and at the end of each evening accepted

back the papers remaining unsold and paid him ¾ths of a cent for each paper sold. In addition he occasionally offered prizes to the decedent and other newsboys in the form of a "movie," or ice cream, or a penknife, or other small articles as a reward for the sale of the greatest number of papers.

"4. The decedent sold on an average of about 45 papers each day, and 35 Sunday papers on Saturday evening. He received 1½ cents for the sale of the latter, but at no time did his earnings from this or any other source exceed the sum of $12 per week, the minimum wage for death awards as fixed by Section 307, Act of April 13, 1927, P. L. 186. The incidents of direction and control exercised by the district manager and supervisor may be stated as follows:

(1) The decedent and other newsboys were required to report at their assigned corners as soon after school as possible. If they were not at their stations when the district manager made his first round delivering papers, he would leave them at a designated place, and if they habitually neglected to report, the corner would be taken away and further papers refused.

(2) The district manager furnished the decedent and other newsboys with a money bag and a shoulder strap with which to display the papers. The word "Press" was printed on the bag.

(3) The decedent and other newsboys were permitted to sell Colliers or the Saturday Evening Post, but this was not a common practice among them. The decedent did sell the Post Gazette after he had checked in each evening on his sales of the "Press."

(4) The district manager asked the decedent and other newsboys not to sell on corners which had been assigned to others. If they did so they were required to remit the profits of the sale, and if they continued to do so their corners were taken away and further papers refused.

(5) The decedent and other newsboys were asked not to sell papers in front of drug stores handling the "Press," and if they refused to desist or continued to do so after notice, their corners were taken away and further papers refused.

(6) If the decedent and other newsboys sold the papers in excess of the price fixed by the Press Publishing Company, their corners were taken away and further papers refused.

(7) If the decedent and other newsboys sold the Sun Telegraph, their corners were taken away and further papers refused.

(8) If the decedent and other newsboys failed to sell a sufficient number of papers on the corners or in the vicinity to which they were assigned, their corners were taken away and further papers refused.

(9) The supervisor of the district occasionally told the decedent and other newsboys how to hold the papers, and urged them to cry out the sale of the paper in newsboy fashion.

(10) The supervisor of the district made periodical rounds of inspection, and if he was of the opinion that the decedent or other newsboys were not making good, he informed the district manager, and if the latter was satisfied, the corners were taken away and further papers refused.

(11) The district manager checked the route each night and settled with the decedent and each newsboy, all of whom were supposed to wait each evening until he made his rounds and had made settlement.

"5. From the foregoing findings we conclude, that on October 1, 1932, the decedent was in the employ of the Pittsburgh Press as a newsboy, receiving from this and all other sources a weekly wage not in excess of $12 per week. On this date neither of the parties had rejected the provisions of Article III, Act of June 2, 1915, P. L. 736, and the amendments thereto.

"6. While actively engaged in selling the Pittsburgh Press on October 1, 1932, in the vicinity of Nobles Lane and Brownsville Road, an automobile, being driven by the holder of a learner's permit, entered upon the sidewalk and struck the decedent, causing injuries which resulted in his immediate death.

"7. The decedent was survived by his parents, Peter and Agnes Balinski. The former had been unemployed for two or three years, except for a few days each month. Their home was heavily encumbered by a mortgage in arrears. The decedent contributed his meagre earnings for their support, and we find them partially dependent upon him at the time of his death.

"8. The burial costs of the decedent were in the sum of $239.14 for services rendered by John D. Schaub's Sons, 425 Brownsville Road, Pittsburgh, no part of which has been paid by the Press Publishing Company."

Our revisory powers on this appeal are limited to a determination of the question whether there is competent evidence to support the findings, and whether the law has been properly applied to them: Hunter v. American Steel & Wire Co., 293 Pa. 103, 141 A. 635; Todd v. State Fund, 295 Pa. 14, 144 A. 819; McGuirk v. Sun Shipbuilding Co., 80 Pa. Superior Ct. 457.

The first five assignments of error relate to the dismissal of the exceptions filed to the first, second, third, subdivisions (1), (6), (7) and (11) of the fourth and the fifth findings of fact. As they all relate to the same question, to wit: the status of the decedent in relation to Shanahan, and through the latter with the Press Publishing Co., defendant, the same will be considered and treated together.

The testimony of Shanahan, as well as that of the other witnesses, definitely establishes the fact that the decedent and all other newsboys purchased papers from Shanahan, which they in turn resold through their own energies and by their own methods, and at a profit to

themselves. The record distinctly negatives any finding that the decedent or any other newsboy was "paid ¾ of a cent for every paper sold." There is no testimony, directly or indirectly, which would permit the implication that decedent was paid anything, either a commission or salary, for any labor performed or service rendered to the appellant. The only control which Shanahan had over decedent or any other of the newsboys, was to refuse to sell them any newspapers if they would not respect the usual customs or understandings prevalent among news dealers. It is also a fact that although Shanahan could refuse to sell papers to an offending newsboy, that very newsboy might obtain papers elsewhere which he could sell wherever he might see fit to expend his energies. The learned court below sustained the finding of the Workmen's Compensation Board, to wit: "...... the decedent was in the employ of the Pittsburgh Press as a newsboy, receiving from this and all other sources a weekly wage not in excess of $12 per week and the decedent sustained injuries by accident while in the course of his employment with the appellant which resulted in death." The judgment rendered is against the Press Publishing Company. The claim petition against E. J. Shanahan was dismissed. The appellant is held responsible upon the theory that Shanahan as its employee and acting within the scope of his authority, hired the decedent as an employee of the appellant, and that the relationship of master and servant existed between the decedent and the appellant at the time of the decedent's accident. There is nothing in the entire record which would warrant the finding that the decedent received a weekly "wage." Neither circumstances surrounding the activities of the newsboys, nor the understanding of Shanahan or the newsboys themselves, warrants such a conclusion.

The evidence establishes that Shanahan neither independently nor as an agent of the appellant, exercised

such authority or control over the decedent, or the newsboys generally, as to establish the relationship of master and servant, thus constituting the decedent an employee of the appellant.

It has been frequently held by our appellate courts that the relationship of master and servant exists where an employer has not only the right to select employees, but to remove and discharge them, and the employer further must have the *sole right to direct what work shall be done and the way and manner in which it must be done.*

The control of the work reserved in the employer which makes the employee a mere servant is a control not only of the result of the work, but also of the means and manner of the performance thereof: Beaver v. G. W. Boyd, 106 Pa. Superior Ct. 24, 161 A. 900; Tyler v. MacFadden Newspaper Corp., 107 Pa. Superior Ct. 166, 163 A. 79; Smith-Faris Co. v. Jameson Hospital, 313 Pa. 254, 169 A. 233; Simonton v. Morton, 275 Pa. 562, 119 A. 732; McColligan v. Pennsylvania Railroad Co., 214 Pa. 229, 63 A. 792.

The case of New York Indemnity Co. et al. v. Industrial Accident Commission et al., 1 Pac. 2nd., p. 12, decided by the Supreme Court of California, is based upon almost identical facts. That court had originally sustained the commission which had awarded compensation, and that case is reported at 294 Pac. 707. A rehearing was granted and by a per curiam decision, the Supreme Court reversed its former decree. We quote from the opinion rendered in the case cited: "We are thus brought to what we deem to be the essential inquiry in the instant proceedings, which is as to whether the nature and degree of control exercised by the publishers of the two newspapers involved in this proceeding, through their district manager, was such as would suffice to justify the finding of the Commission to the effect that newsboys, by virtue of such control

stood in the relation of employees of the publishers of said newspapers, and as such have a compensable claim for an award arising out of injuries received in the distribution to the public at large of their daily product. In the case of Hillen v. Industrial Accident Commission, 250 Pac. 570, it was held by this court that the essential test by which to determine whether in doubtful cases the relation between a workman and those for whom he was rendering service was that of an employee or an independent contractor, was not so much dependent upon whether he received wages or whether he was to devote all or a portion of his time to the performance of his specified service, but was rather dependent upon the extent of control or right of control which the so-called employer was to exercise over its so-called employee. When we undertake to apply the reason of that case to the admitted facts of the instant proceedings, we are constrained to hold that the limited amount of control which the publishers of these two newspapers undertook to exercise over the newsboys, including Eustace, who daily purchased from their district manager a specified number of copies of their daily issues for a specified sum, payable in cash or at the close of each day's sales, and who undertook the retailing of the same to such customers among the public at large as they were able to attract, or procure at a specified place and price fixed by the publisher, would not as a matter of law be sufficient to *constitute such newsboys the employees of the publishers of said newspapers,* so as to entitle them to receive compensation at the hands of the Industrial Accident Commission in the event of injuries received by them in the course of their activities in making or attempting to make individual sales of the copies of said newspapers. We are satisfied that the finding of the Commission upon the undisputed facts presented before it amounted to an erroneous legal con-

clusion, which this court possesses jurisdiction to review." (Italics supplied)

In a suit instituted against the Birmingham Post, 149 Southern 74, and decided by the Supreme Court of Alabama, it was held that a newsboy required to call at stated times for papers, to be at a stand to receive other editions, to sell at a prescribed price and in a defined area, and to account daily at a specific rate for all papers not returned, did not create the relationship of master and servant so as to cause the publisher to be liable for compensation where a newsboy was killed by a motorist while selling papers. That court held the newsboy to be an independent contractor.

To same effect see Creswell v. Charlotte News Publishing Company and American Liability Insurance Co., 204 N. C. 380 (1933); also Associated Indemnity Corp. v. Industrial Accident Commission, 2 Pac. Rep. 2nd Series, p. 51.

Quoting from the opinion of Mr. Justice SCHAFFER in Simonton v. Morton, supra, "There necessarily must be a certain control by the contractee of all undertakings such as the one we are considering, otherwise he could not safeguard himself as to the satisfactory accomplishment of the work. 'As a practical proposition, every contract for work to be done reserves to the employer a certain degree of control—at least to enable him to see that the contract is performed according to the specifications. The employer may exercise a limited control over the work without rendering the employee a mere servant, for the relation of master and servant is not inferable from the reservation of powers which do not deprive the contractor of his right to do the work according to his own initiative so long as he does it in accordance with the contract. The control of the work reserved in the employer which makes the employee a mere servant is a control, not only of the result of the

work, but also of the means and manner of the performance thereof:' "

In the case of McColligan v. Pennsylvania Railroad Co., supra, the facts were as follows: The railroad company owned cabs, and by a written agreement let them out to drivers in consideration of a fixed sum per day. The agreement provided that the driver assumed all responsibility for damages to persons or property; that he should not drive a horse any longer than 6½ hours per day; that he should wear the prescribed uniform; that he should abstain from the use of intoxicating liquors, and that he should conform to the prescribed rates and regulations. Among the regulations certain boundaries were prescribed beyond which the driver could not go without permission. He was not permitted to perform other types of work during the term of his lease. The defendant company employed a cab agent to supervise this work, to secure men for the work, to make contracts with the drivers, and to enforce the terms and conditions of the lease.

The company had no interest in the proceeds derived from fares received from passengers, and was only entitled to receive that amount which under the contract the cab drivers were to pay for the use of the cabs.

The question which arose in the case cited was whether or not the defendant company was liable to a third party on the theory that one of the cab drivers was the defendant's agent and servant. The lower court affirmed a point in favor of the defendant resulting in a verdict for the defendant, and upon appeal the Supreme Court affirmed the lower court upon the theory that the cab driver was an independent contractor, or rather that the relationship between the railroad company and the cab driver was that of bailor and bailee. It was contended by the plaintiff that the conditions and regulations embodied in the contract were consistent with the relationship of master and servant, and

that the control retained by the railroad company over the cab driver was such as to be inconsistent with the relationship of bailor and bailee. The court in denying the contentions of the plaintiff stated, inter alia: "The conditions and regulations, incidents of the contract of letting, in some instances it is true are consistent with the relation of master and servant, but not inconsistent with that of bailor and bailee. If the company in order to protect its property and give the traveling public modern conveniences and suitable accommodations, has deemed it advisable to embody in the contract of letting certain reasonable regulations, no legal or business reason can be properly assigned why the real relation of the parties should be changed thereby." See also Brooks v. Buckley & Banks, 291 Pa. 1, 139 A. 379.

In the case of Tyler et al. v. MacFadden Newspaper Corp., supra, our Brother KELLER clearly defines the distinction which governs in the instant case. "...... where one who contracts to perform a lawful service for another, is independent of his employer in all that pertains to the execution of the work, and is subordinate only in effecting a result in accordance with the employer's design, he is an independent contractor. This is so whenever one renders service in the course of an occupation, representing the will of his employer only as to the result of his work and not as to the means by which it is accomplished."

In the case of Phila. Record Company v. Curtis Martin Newspapers, Inc. et al., 305 Pa. 372, 157 A. 796, while the facts are different from those in the instant case, the expression of the Supreme Court with regard to the relation of the newsboy to the publisher of the paper is illuminating: "The original organization of newsboys had no contractual relation with the defendants; individually or as a group they could discontinue selling their papers at any time and they have no rights against the defendants which equity could safeguard.

In the absence of a contract to sell them to particular individuals, defendants can sell their papers to whomsoever they please. *The newsboys were not employees of the defendants; they were independent vendors."* (Page 376) (Italics supplied)

The relationship between Shanahan and the newsboys being in the first instance that of vendor and vendee, we are of the opinion that the restrictions enumerated and understood in advance did not change that relationship or create an employment.

The assignments of error are sustained, the judgment of the lower court is reversed, and the record is remitted to the court below with instructions to enter judgment in favor of the defendant.