## NATIONAL LABOR RELATIONS BOARD v. CITIZEN-NEWS CO.

### No. 9994.

Circuit Court of Appeals, Ninth Circuit.

April 2, 1943.

Dissenting Opinion April 8, 1943.

---

See, also, 134 F.2d 970.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Gerhard P. Van Arkel, Asst. Gen. Counsel, and Joseph B. Robison and Helen F. Humphrey, Attys., N.L.R.B., all of Washington, D.C., and Maurice J. Nicoson, Atty., N.L.R.B., of Los Angeles, Cal., for petitioner.

Willis Sargent, of Los Angeles, Cal., and Harlan G. Palmer, of Hollywood, Cal., for respondent.

John A. Cronin, of Los Angeles, Cal. (Abraham J. Isserman, of Newark, N. J., of counsel; Elliott L. Biskind, of New York City, on the brief), for intervenors, Los Angeles Newspaper Guild and Leonard Lugoff.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

The National Labor Relations Board, hereinafter referred to as the Board, has petitioned this court to enforce its order made in a proceeding instituted by the issuing of a complaint by the Board on June 27, 1938. The complaint was issued during a strike called on May 15, 1938, by employees who were members of the Los Angeles Newspaper Guild. Thirty-three days after the issuing of the complaint a contract was entered into between the respondent and the Guild for the purpose of settling the strike and disposing of the issues raised by it.

The immediate cause of the strike was the discharge of three employees of respondent who were members of the Guild. Two more were discharged after the strike was voted and before it became effective.

The Board, in its findings, fairly summarized its complaint as follows: "The complaint alleged, in substance, that the respondent (1) discriminatorily discharged and refused to reinstate Roger C. Johnson, Mellier G. Scott, Jr., Elizabeth Yeaman, Karl Schlichter, and Helen Blair Thurlby, and did thereby discourage membership in a labor organization; (2) refused to bargain collectively in good faith with the Guild, the collective bargaining agency designated by the majority of the employees in an appropriate unit; and (3) by the foregoing acts interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act [29 U.S.C.A. § 157]."

The Board found against the first and second charges thus summarized, which necessarily disposed of the third charge, thus leaving no basis for affirmative action by the Board. We will, however, further consider some of the contentions of the Board, which are broader than its summary of the complaint.

The Board further found the facts to be as follows: "We find that by the continuing expressions of criticism and disparagement of the Guild, the criticism of the use of outside negotiators, the attempt to secure contracts with employees' committees in the various departments, the threat to cut wages in the event that the classified-advertising employees failed to sign a contract, and the threat to discharge employees if a contract with the Guild was consummated, the respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7 of the Act."

The expressions of criticism and disparagement of the Guild and the criticism of the use of outside negotiators were well within the right of free speech of the respondent. We have considered this subject in the companion case this day filed, and it need not be further discussed.

With reference to the attempt to secure contracts with employees' committees in the various departments, the Board found in detail as follows: "In late June 1937, about the time of the Guild convention, at the request of the respondent, committees representing the various departments were formed by the employees and met with the respondent to discuss wages, working conditions, and grievances. At these meetings, the respondent proposed contracts to the various committees. The business department entered into a contract, through its committee, but the editorial and the classified-advertising departments refused. When the editorial-department employees informed Palmer that they would not violate the Guild constitution and deal directly with him through a committee, Palmer asked, 'Don't you know what you want? Can't you make up your own minds? Do you prefer to have someone in Washington

or New York or some place dictate to you?' On several other occasions Young and Brandon also commented unfavorably on the Guild's practice of using outside negotiators."

Two witnesses called by the Board testified on this subject.

Elizabeth Yeaman testified that the respondent asked each department to appoint a committee to discuss an agreement on wages and working conditions. The editorial employees appointed a committee to meet with Judge Palmer, president of the respondent, in pursuance of the invitation. At that time a majority of the editorial department employees were members of the Los Angeles Newspaper Guild. Roger C. Johnson, an editorial employee who was president of the Guild unit to which respondent's editorial employees belonged, was on this committee. He testified as follows:

"Q. Do you know how that conference happened to be held? A. Yes, I do. Mr. Young invited me into his office one day and explained to me that various departments were getting together to discuss working conditions and wages; that they wanted to iron out little things that had cropped up during the course of business, and to discuss what the wages should be, and in general, to iron out little petty grievances.

"He asked me if the editorial department would like to do as the rest had done, to meet with Judge Palmer or their department heads to discuss the matters that I have just mentioned to you.

"I explained to him that the editorial department was always cooperative, and that it would have no objection, as far as I could see, to meeting on such a basis, although I would have to first talk it over with the members of the Guild.

"The meeting was held in Judge Palmer's office, and Judge Palmer explained that the reason for being there was to discuss our working conditions and wages, and see if there were any adjustments necessary in the salaries, and wanted to get our opinion about ironing out any little difficulty that may have cropped up.

"James Francis Crow described the editorial department's attitude and desire to cooperate.

"During the course of the meeting Judge Palmer reached over on his desk and picked up a paper and said, 'This agreement pertaining to the—' I believe he said the business office— 'contains such and such proposals for working conditions.'

"I became a little bit alarmed at that. I didn't say anything. I felt that as Guild members we couldn't participate in any such agreement with the management because our Guild constitution does not permit us to negotiate such conditions for ourselves.

*    *    *    *    *    *    *

"Near the conclusion of the conference in the Judge's office I explained that under the Guild procedure it would be necessary for the Citizen News unit to instruct the Los Angeles Guild that it wanted to bargain collectively with the Citizen News; that the executive board at our suggestion would have to select negotiators for us; and that those negotiators would have to be our spokesman, and that as Guild members we couldn't participate in any agreement such as the other departments throughout the paper, as I understood, had been signing, or participating in.

"Judge Palmer remarked that if that was the way we preferred to do it, it was all right with him, although my personal impression was that he was disappointed that he could not then and there or at some very near time work out an agreement of some kind."

Motion to strike out the witness' impression was made and granted.

"The Witness: Judge Palmer said that the other departments were getting together to discuss their working conditions; that he didn't see why we couldn't do so; and in line with that I explained that under the Guild's program and constitution we could not follow that procedure."

Elizabeth Yeaman, the other witness called by the Board, testified concerning the same meeting, that upon getting the invitation to the meeting in June 1937 the members of the Guild held a unit meeting to discuss it and decided that "inasmuch as we were members of the Guild we could enter into no company union agreement of any kind; that any contract or agreement reached would have to be reached through the Guild." She testified that at the meeting with Judge Palmer, one of the members of the committee explained to Judge Palmer that they were prohibited by the constitution of the Guild from submitting a schedule of wages and working conditions as the other departments had done. In that connection the witness testified that

"he [Judge Palmer] didn't seem to be able to understand it because he kept putting the proposition right back to Jim, saying, 'Well, what do you people want? What salaries do you want? We are making up the budget for salary adjustments. Give me some idea of what you want.' And Jim would begin patiently all over again and go through the same explanation; and this went on until things were becoming very tense, and finally Judge Palmer said, 'What is the matter with you people?' He grew very angry. 'What is the matter with you people? Don't you know what you want? Can't you make up your own minds? Do you prefer to have somebody in Washington or New York or some place dictate to you? Can't you decide what you want for yourselves? Would you prefer to be dictated to by strangers miles away from you?'"

The witness testified she then stated the desire of the Citizen-News unit to bargain through the Guild. She testified that Judge Palmer became extremely angry. "He got red in the face. He was furious."

■ It is difficult to see how this meeting could be held to be an unfair labor practice. The respondent was dealing directly with the only labor organization of his employees and was trying to get that organization to express its wishes. This is essential to collective bargaining. It declined to do so because of its claim that its own internal organization prevented the local unit from entering into negotiations directly with the employer. There is no dispute of the testimony of Roger Johnson that Palmer accepted this situation. Certainly there was no attempt to prevent the Guild members from bargaining collectively but on the contrary an attempt to get them to do so. It should be again observed that the statements of Palmer regarding Guild procedure were will within the limits of free speech.

In regard to the finding as to the threat to cut wages in the event the classified advertising employees failed to sign a contract, the detailed finding of the Board stated as follows: "When the classified-advertising department employees, being desirous of acting through the Guild, refused to sign the contract offered by the respondent, Young informed them that their salaries would be the first to be reduced in the event that business decreased since the other departments would be protected under their contracts. While on one occasion this remark was made in answer to a question of the employees, on another occasion it was entirely gratuitous."

■ This statement, instead of being a threat of reprisals by the respondent, was merely an assertion of the fact that where employees were protected by a contract fixing their compensation this compensation would not be reduced, whereas economic conditions might require retrenchment as to other employees who were not protected by similar contracts. Certainly an employer would have a right to reduce wages of his employees who were not protected by a contract fixing their wages when some reduction was made necessary by economic conditions. Directing the employees' attention to this circumstance would not constitute an unfair labor practice.

The finding as to the threat to discharge employees if a contract with the Guild was consummated apparently refers to another statement in the findings as follows: "In similar vein, Swisher informed Alexander Swan, an editorial employee, that if the Guild continued the contract negotiations, he would be negotiating himself out of a job inasmuch as retrenchment would be necessary if concessions were made to the Guild. Swisher also made a similar remark about Swan to Crow. On another occasion Young told Schlichter, a business-department employee who was subsequently discharged, that the progressive wage scale and severance pay provisions of the proposed contract would cause discharges and that Stanley Speer and one other employee would lose their jobs. The foregoing statements of supervisory employees were plainly calculated to destroy the prestige of the Guild and inculcate in the minds of the employees the fear that the efforts of their representatives would be profitless."

■ This statement sums up to the proposition that Swan and Speer would lose their jobs if the new wage scale of the proposed contract made it necessary to discharge some of the employees. The proposed discharges were not predicated upon their labor union affiliations or activities, but upon the ground that they were the least useful employees.

The conclusions we have reached make it unnecessary to consider the question of whether the practices here involved were, or were shown to have been, within the jurisdiction of the National Labor Relations Board to correct. The jurisdiction of the Board is defined by section 10 of the

National Labor Relations Act, 29 U.S.C.A. § 160, as the prevention of unfair labor practices affecting commerce. In the present case, since we find that no unfair practices existed, it becomes wholly unnecessary to consider whether, if they had existed, they would have affected commerce so as to give the Board jurisdiction to prevent them.

We conclude that there is no sufficient evidence to support the order of the Board and its enforcement is refused.

The Board, in its brief, refers to the conduct of Brandon as head of the classified-advertising department, who unnecessarily required the employees in his department to come to work on Saturday as "a penalty imposed to retaliate against the employees for an action taken by them to protect their collective activity in the Guild; as such it constituted a threat to their freedom of activity as members of that organization." Neither the findings nor the evidence justify this assertion of fact and no such charge is made in the complaint filed by the Board. We will further consider this matter, omitting as immaterial a vulgar remark ascribed to Brandon.

The Board incorporated in its findings an evidentiary finding that Brandon had required the employees in his department to work on Saturdays. It did not find that this was an unfair labor practice or base any order thereon. The finding is as follows: "In October 1937 Brandon applied for membership in the Guild and urged Johnson to secure his admission. The Guild refused to accept him as a member, fearing that his move was an attempt to dominate the Guild or at least the advertising salesmen in it. Shortly thereafter, at a meeting of the salesmen, Brandon remarked, 'you fellows have certainly tried to screw me up,' and at another meeting a few days later, he said: 'You are thinking too much of unions and not doing your work.' Late in October 1937, at another meeting at which he again discussed unions, Brandon again complained that the men were not working hard enough and issued an order that they would have to work on Saturdays, despite the fact that there was little to be done in the department on that day. For a time thereafter the salesmen were required to work on Saturdays. When Johnson complained to Business Manager Young that the men felt that they were being discriminated against because of their Guild activity the latter remarked that Brandon had a bad temper and had acted hastily and promised to speak to Brandon to see what could be done about the matter."

In considering this finding it should be remembered that the Guild was completely organized at that time. Roger Johnson, the president of the Guild, testified in regard to the incident as follows:

"A. In this same general period—I believe it was October—I went to Harwood Young, business manager, and told him that some of the display men were complaining to me that they were being required to work Saturdays now which was something that had not been required of them very much in the past.

"In fact, most of the advertising men found nothing to do on Saturdays, and there could be no reason why they should be required to work on Saturdays at this particular time.

"I told Mr. Young that the display men felt that their interest in the Guild and their activities in the Guild had aroused the ire of Mr. Brandon who had ordered the Saturday work, and that it was bound to create a lot of bad feeling unnecessarily.

"I told Mr. Young that if the men were required to work on Saturdays that it was essential that they should be given an explanation as to that and should be told by him or some person in authority that it was not because of their Guild activities, because we certainly, as Guild members, didn't want to disrupt the organization.

\*   \*   \*   \*   \*   \*   \*

"I had told him previously; and he said yes, that Mr. Brandon had done this thing hastily; that it was a bad thing to do; and that Mr. Brandon in the past had from time to time caused the management embarrassment because of his quick temper and his— well, I will put a period there.

\*   \*   \*   \*   \*   \*   \*

"He said that he would do his best to correct the situation. I told him I would be glad to cooperate with him because I didn't want any flare-ups in the advertising department over a small misunderstanding; and the conversation ended when he told me he would talk with Mr. Brandon and see if he couldn't correct the misapprehension and have some of the men, perhaps, not come down on Saturday if the display department could operate efficiently that way."

Karl Schlichter testified as follows:

"This meeting was held late in October.

"Trial Examiner Kennedy: Where?

"The witness: In the office of the Citizen-News, in Judge Palmer's office, the room in which the meetings were generally held in the Citizen-News building.

"Trial Examiner Kennedy: Who was present?

"The witness: Harry Brandon, advertising manager, myself, and all of the members of the advertising department should have been there—excepting Miss Coloran, who never attended those meetings.

"Mr. Brandon was talking about unions, as I recall, and said that the men were not working hard enough, and would have to think more about their work or some drastic action would be taken on that from now on; that they would have to consider coming to work every Saturday morning, and I believe someone interrupted him there and said that there was not very much to do—that they could not sell advertising.

\*  \*  \*  \*  \*  \*  \*

"Q. How long did the Saturday work last? A. I believe it lasted three or four Saturdays. Then it was called off, and I believe started once more. Inasmuch as I wasn't involved, I don't know how many had to work Saturday, and exactly how long they had to work."

James Francis Crow testified at length to what occurred in the meeting of the Guild in connection with the proposal to make Harry Brandon a member of the Guild. He stated that instead of voting directly on the proposition he agreed that they present a resolution "drawing the lines of eligibility throughout the Citizen-News plant." The presentation of this resolution was followed by a long and stormy session at which S. C. Montrose, one of the members, spoke against the resolution on the ground it would deny membership to Harry Brandon. The resolution was passed, however, with only three dissenting votes. He continued as follows:

"Consequently [subsequently?] I was told by members of the display department that Harry Brandon had ordered them to report for work on Saturdays, as they had not been doing previously. I went among the display department, and asked them individually if they wished the Guild to do anything about this matter of working on Saturdays. They told me no. Nevertheless, I asked Roger Johnson if he would not speak in an unofficial way to Mr. Young to see if members of the display department might not be spared the hardship of coming to work on Saturday.

"Roger Johnson told me that Mr. Young said the action had been hasty, and that he would see about it."

There was no other evidence on this subject.

With reference to the finding "the Guild refused to accept him as a member fearing the move was an attempt to dominate the Guild, or at least the advertising salesmen in it", the only evidence on that subject concerning the Guild is in the following testimony by Schlichter: "I told them that I felt this was an attempt, following the failure of the first company union, to make the Guild a company union and to emasculate it." He said: "I told them I felt this was an attempt to have Brandon dominate the Guild, particularly the display advertising men in the Guild, as he had dominated the sales meetings, and that I was very much against the acceptance of Brandon as a Guild member."

James Francis Crow testified: "\* \* \* I was faced with the prospect of offending Harry Brandon by denying him membership in the Guild directly, or with the prospect of having Harry Brandon become a member of the Guild and possibly working against us."

While it is wholly immaterial why the Guild refused to accept Brandon as a member, it is clear that there is no basis for the inference that Brandon's purpose in applying for membership was not bona fide. The fact that some or all of the Guild members may have suspected him of an attempt to work against the union is no evidence to support the inference that Brandon had such a purpose. Nor does the fact that the men felt they were being discriminated against because of their Guild activity when the order was given requiring them to report for duty on Saturday constitute evidence of such discrimination. If by the phrase "guild activity" used in the Board's finding it is intended to convey the idea that Brandon was endeavoring to punish members of the Guild because they had excluded him from membership it can hardly be contended that this constituted the sort of discrimination which the act was intended to prevent, for confessedly the action of Brandon was a purely personal one based upon a person-

al grievance which had nothing to do with the management of the respondent company. It is true that although the management may be entirely ignorant of oppressive acts the Board may take jurisdiction and order the suppression or discontinuance of such acts. This power is placed upon the ground that although the employer is not responsible for the misconduct the Board has a right to protect the employees from such oppressive conduct in the future if it is necessary to do so. Here the alleged discrimination had ceased long before the complaint was· brought to the Board and as shown by the testimony the union did not intend or desire that the matter should be given further consideration.

Consequently there was no occasion for an enforcement order based upon this incident.

Order set aside.

DENMAN, Circuit Judge (dissenting).

A. The majority decides an important federal question in conflict with the decisions of the Supreme Court. It rejects pertinent testimony as not substantial, and substitutes its inferences for equally if not more rational inferences of the Board supporting its findings of "Interference, restraint and coercion".

The decisions so in conflict are National Labor Relations Board v. Pennsylvania Greyhound Lines, 1937, 303 U.S. 261, 271, 58 S.Ct. 571, 576, 82 L.Ed. 831, 115 A.L.R. 307, in which, in holding that continued recognition of a company union would be an obstacle to the exercise of· the employees' rights, the Court said, "The inferences to be drawn were for the Board and not the courts." And National Labor Relations Board v. Link-Belt Co., 1940, 311 U.S. 584, 597, 61 S.Ct. 358, 365, 85 L.Ed. 368, where the Court reversed the Circuit Court's refusal to enforce an order saying, "We are of the opinion that the Court of Appeals in reaching that conclusion substituted its judgment on disputed facts for the Board's judgment—a power which has been denied it by the Congress." See also National Labor Relations Board v. Waterman S. S. Co., 1939, 309 U.S. 206, 208, 209, 226, 60 S.Ct. 493, 84 L.Ed. 704.

If labor relation cases are so to be treated in this Circuit, there will have to be a revision of the technique of the lawyers' presentation of cases of their employer clients.

B. The majority decides another important point of federal law in conflict with the decision of the Supreme Court in Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 217, 230, 59 S.Ct. 206, 83 L.Ed. 126, in holding that the Board cannot order an employer to desist from committing unfair labor acts on evidence of such acts in the past and not existing when the accusing union files its complaint with the Board.

A. *The coercion of advertising manager Brandon, of the advertising salesmen under him during October 1937 in the Guild's organizational drive in his department to unionize its employees.*

Under the heading of "Interference, restraint and coercion" the Board, after discussing Brandon's conduct and that of other supervisory agents of the employer, finds that " * * * by the continuing expressions of criticism and disparagement of the Guild, the criticism of the use of outside negotiators, the attempt to secure contracts with employees' committees in the various departments, the threat to cut wages in the event that the classified-advertising employees failed to sign a contract, and the threat to discharge employees if a contract with the Guild was consummated, the respondent interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in section 7 of the Act."

Only by weighing and deliberately rejecting the following evidence, pressed on the Court in briefs and argument, can it be said Brandon's conduct affords no substantial support for the findings.

Concerning the period of Brandon's coercion, it was emphasized at the hearing that it was when the Guild was conducting its drive in October 1937. Though the testimony at page 252 of the record is, "Yes, In my judgment it was in about October when the organizational drive in the commercial department had got under way and members were being signed up, Harry Brandon, the display advertising manager, mentioned to me that he understood he wasn't going to be admitted to the Guild and wanted to know if I couldn't do something about it." and there is no evidence to the contrary (as pointed out in the briefs) thus fixing that as the month of the drive and though it was in that month that Brandon's coercive acts occurred, the majority opinion ignores the record and states concerning the finding of coercion, "In con-

sidering this finding it should be remembered that the Guild was completely organized at that time."

I dissent from the majority opinion's weighing the evidence of the time of the coercion, rejecting it as not substantial and then finding to the contrary. The deliberation in such rejection is evident from that opinion's statement that "There was no other evidence on this subject."

I also dissent from the similar weighing as unsubstantial and hence rejecting the following evidence of interference, restraint and coercion in and before October 1937.

Brandon held frequent meetings of his department employees and spent much and sometimes all of the time in denouncing the Guild, using such language to the men solicited to be organized as, " . . . that one of these days the *white collar workers* like us are going to get ourselves some guns and go out and shoot *those union bastards.*" (Emphasis supplied.)

The employment of these men depended on their bringing in advertising accounts. Robbing them of their production time by such violent attacks on the union they then contemplated joining, and later joined, is one of the most impressive methods of interference and coercion.

I dissent from the rejection of this evidence warranting the Board's inference of a coercive interference with the union organization of the men.

Brandon, finding the organization of his men progressing, changed his tactics. He sought to join the "union bastards" and become a member of the Guild. I dissent from the holding of the majority that the Board could not infer that his change of attitude was for the purpose of disrupting the Guild and the majority's holding that, " * * * it is clear that there is no basis for the inference that Brandon's purpose in applying for membership was not bona fide." Here clearly is another violation of the principle of the Greyhound Lines case, supra, that "The inferences to be drawn were for the Board and not the courts."

The majority opinion after omitting Brandon's attack on the organizing union bastards recites a part of the testimony of Brandon's coercive conduct after the union rejected his application to join it. It recites that though the advertising employees used Saturdays in their soliciting and did not work in the office on that day of the week, nevertheless after his rejection by the union they were compelled to report there and do nothing. What is omitted is the character of the order he gave them. It was, "Come Saturday mornings and sit at your desk, keep working at your desk and smell your own feet stink." I do not agree with the majority that this vulgar remark is "immaterial" and hence to be omitted from the opinion. Obviously the Board was entitled to infer that Sales Manager Brandon intended to punish and shame the men for their union activity and their refusal to allow him to join the union to disrupt it.

I dissent from the holding of the majority that " * * * confessedly the action of Brandon was a purely personal one based upon a personal grievance which had nothing to do with the management of the respondent company." The question arises—Who has so confessed? Brandon has made no such confession and it is significant that the employer did not call its manager to testify. The Board has made no such confession and of course no witness can make such a confession for the Board or as Brandon's agent. Here the majority opinion seems to have made a finding of the purpose of Brandon's acts based on a confession non-existent in the record, and to substitute its own inference for the entirely proper inference of the Board.

B. I dissent from the holding that the Board cannot make an order to cease and desist from an unfair labor act because the employer has ceased committing the offense. The majority holding is, "Here the alleged discrimination had ceased long before the complaint was brought to the Board and as shown by the testimony the union did not intend or desire that the matter should be given further consideration Consequently there was no occasion for an enforcement order based upon this incident."

The statement that the "discrimination" (the finding is "coercion") had ceased before the Guild's complaint was brought to the Board, has no support in the record. It nowhere appears when the Guild filed its charges with the Board. Obviously the Board's complaint would issue *after* Brandon's coercive acts. Equally obvious that the *Guild* cannot waive the Board's right to find "an unfair labor practice".

The quoted holding of the majority is contrary to the law as declared by the Supreme Court in Consolidated Edison Co. v.

National Labor Relations Board, 305 U.S. 197, 217, 225, 59 S.Ct. 206, 83 L.Ed. 126. There the employer had voluntarily ceased the employment of union spies prior to November 1936, 305 U.S. at page 230, 59 S.Ct. 206, 83 L.Ed. 126. The Board's order to cease and desist from such practices was made a year later, November 10, 1937. 305 U.S. at page 217, 59 S.Ct. 206, 83 L.Ed. 126. The Supreme Court disposed of the contention made by the majority here, 305 U.S. at page 230, 59 S.Ct. at page 217, 83 L.Ed. 126 stating: "With respect to industrial espionage, the companies say that the employment of 'outside investigating agencies' of any sort had been voluntarily discontinued prior to November, 1936, but the Board rightly urges that it was entitled to bar its resumption." Holding similarly are N.L.R.B. v. Calumet Steel D., etc., 7 Cir., 121 F.2d 366, 371; Pueblo Gas & Fuel Co. v. N.L.R.B., 10 Cir., 118 F.2d 304, 307.

Because the case has been considered under principles so subversive of those established in these decisions of the Supreme Court, it is my opinion that it should be reheard and considered de novo.

