**HEARST PUBLICATIONS, Inc., v. NATIONAL LABOR RELATIONS BOARD, and three other cases.**

Nos. 10112, 10114, 10115, 10123.

Circuit Court of Appeals, Ninth Circuit.

June 10, 1943.

Oscar Lawler, John M. Hall, A. Laurence Mitchell, all of Los Angeles, Cal. (Lawler, Felix & Hall, of Los Angeles, Cal., of counsel), for petitioner Hearst Publication.

Binford & Binford, L. B. Binford, and Howard M. Binford, all of Los Angeles, Cal., for petitioner Stockholders Pub. Co., Inc.

Flint & MacKay, H. S. MacKay, Jr., and Edward L. Compton, all of Los Angeles, Cal., for Hearst Publications.

T. B. Cosgrove, F. J. O'Neil and F. B. Yoakum, Jr., all of Los Angeles, Cal., for petitioner Times-Mirror Co.

Robert R. Watts, Gen. Counsel, N.L.R.B., Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel,

and Ruth Weyand, Louis Libbin, and Robert Todd McKinlay, Attys., N.L.R.B. all of Washington, D. C., and Richard A. Perkins, Regional Atty., N.L.R.B., of San Francisco, Cal., for respondent.

Arthur W. A. Cowan, of Philadelphia, Pa., for International Printing Pressmen and Assistants' Union of North America, A.F.L., as amicus curiae.

Before DENMAN, MATHEWS, and STEPHENS, Circuit Judges.

STEPHENS, Circuit Judge.

Four publishers of newspapers separately petition this court for the review of orders of the National Labor Relations Board, and the Board petitions this court for orders of enforcement. All of the petitions are considered and disposed of in this opinion.

Each of the four newspaper petitioners publishes a newspaper in Los Angeles, California. Hearst Publications, Incorporated, Los Angeles Examiner Department, publishes the "Examiner." Stockholders Publishing Company, Inc., publishes "The News." Hearst Publications, Incorporated, Los Angeles Evening Herald and Express Department, publishes the "Herald-Express," sometimes called the

"Herald." The Times-Mirror Company publishes the "Times."

A petition for investigation and certification of representatives, under § 9(c) of the so-called Wagner Act, 29 U.S.C.A. § 159(c), was filed with the Board against each of petitioners by the Los Angeles Newsboys Local Industrial Union, No. 75, an affiliate of the Congress of Industrial Organizations. The proceedings in each case resulted in the Board's Decision and Direction of Elections on January 9, 1941, in which the Board found that questions affecting interstate commerce had arisen, and that designated newsboys were employees of the publisher within the meaning of § 2(3) of the Act, 29 U.S.C.A. § 152(3), and constituted appropriate units for the purposes of collective bargaining. As the outcome of the elections directed to be held, the Board certified the Union as the bargaining representative of the newsboys within each appropriate unit.[1]

After the filing by the Union of a charge against each publisher alleging unfair labor practices, the Board issued a complaint against each stating that the Union was a labor organization within the meaning of the Act, that the publisher had refused to bargain collectively with the Union, which

---

[1] The appropriate units with respect to petitioners were defined in the Board's decision and Direction of Elections, and amendments thereto, as follows:

(a) Los Angeles Examiner: "all newsboys engaged in the street sale of the Examiner at established spots 4 or more hours a day, 5 or more days a week, within Los Angeles, California, except temporary newsboys."

" * * * the term 'established spot' * * * refers to a place where a newsboy has engaged in the street sale of the Times or the Examiner, as the case may be, 5 or more days a week for a period of 6 consecutive months or more, and the term 'temporary' newsboy * * * includes a newsboy who has engaged in the street sale of the Times or the Examiner, as the case may be, at an established spot for 30 days or less."

(b) The News: "all full-time newsboys and checkmen who are engaged to sell the News within Los Angeles, California, excluding bootjackers, temporary, casual, and part-time newsboys."

With respect to the News, the term "full-time newsboy means a newsboy who sells to the general public Five, Six, Eight, Nine and Ten Star editions, or Six, Eight, Nine and Ten Star editions of the News, 5 or more days a week, and means a newsboy who sells the Four Star edition and previous editions of the News for a minimum of four hours per day between the hours of 4 o'clock a. m. and 10 o'clock a. m., five or more days a week."

(c) Los Angeles Evening Herald and Express: "all full-time newsboys and checkmen who are engaged to sell the Herald within Los Angeles, California, excluding bootjackers, temporary, casual, and part-time newsboys."

"Thus defined with respect to the Los Angeles Evening Herald and Express, the term 'full time' newsboy means a newsboy who regularly sells to the public five or more editions a day, five or more days a week: The term 'part time' newsboy means a newsboy who sells to the public less than five editions a day or who sells to the public all or any of the daily editions published by the Los Angeles Evening Herald and Express less than five days a week."

(d) Los Angeles Times: "all newsboys engaged in the street sale of the Times at established spots 4 or more hours a day, 5 or more days a week, within Los Angeles and Glendale, California, except temporary newsboys."

"Established spot" and "temporary spot" defined under (a) herein.

was the chosen representative of a defined appropriate unit of the publisher's employees, that by its refusal the publisher was engaging in unfair labor practices within the meaning of § 8(1) and (5) of the Act, 29 U.S.C.A. § 158(1) and (5), and that the said practices affected interstate commerce. The Board rendered its final decisions and orders on March 30, 1942, in each instance directing the publisher to cease and desist from its refusal to bargain collectively with the Union and, upon request to bargain collectively with such Union. These are the orders of which the Board seeks enforcement, and of which the publishers seek review on the ground that there is no substantial evidence to support the findings or conclusions of the Board.

Under §§ 9(c) and 10(a) of the Act, 29 U.S.C.A. §§ 159(c) and 160(a), the Board has jurisdiction over any unfair labor practice "affecting commerce." The Board found both in the certification case and in the complaint case that the unfair labor practices of each of the newspapers bore a close and substantial relation to interstate commerce and tended to lead to disputes burdening the free flow of commerce, and concluded that they affected commerce within the meaning of § 2(6) and (7) of the Act, 29 U.S.C.A. § 152(6) and (7). Each of the publishers distributes a small percentage of its newspapers outside the state, obtains its newsprint and mats, two of its principal raw materials, from outside the state, uses one or more of the National News and photographic wire services, publishes a number of nationally syndicated articles prepared outside the state, and devotes an appreciable percentage of its space to national advertising.

None of the publishers disputes the fact that it is engaged in interstate commerce, but each denies that any of its activities in connection with its newsboys could lead to any situation which would affect such commerce. Each advances the argument that when particular activities are intrastate in character, they are included within the scope of the Act only "if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions." National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893, 108 A.L.R. 1352. See in accord: Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 222, 59 S.Ct. 206, 83 L.Ed. 126; Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 467, 58 S.Ct. 656, 82 L.Ed. 954; National Labor Relations Board v. Hearst, 9 Cir., 102 F.2d 658, 662.

It seems clear that the very considerable factor of street sales in connection with the interstate business being carried on by each of the newspapers concerned herein cannot be separated from other phases of such business so as to distinguish this factor as intrastate business and some other factor as interstate business. It seems likewise clear that a disturbance in the street sales distribution of any one of these metropolitan dailies would materially affect the whole business and a fortiori would affect the free flow of interstate commerce. Such a conclusion was reached by this court in connection with drivers who transported newspapers to various stations throughout the city, National Labor Relations Board v. Star Pub. Co., 9 Cir., 97 F.2d 465. See in accord: Associated Press v. National Labor Relations Board, 301 U.S. 103, 129, 57 S.Ct. 650, 81 L.Ed. 953; Virginia Electric & Power Co. v. National Labor Relations Board, 4 Cir., 115 F.2d 414, 415, upheld on this point 314 U.S. 469, 476, 62 S.Ct. 344, 86 L.Ed. 348.

It should be mentioned here that the retail vendors of newspapers, described in the "appropriate units", are adult men, not boys, engaged in the street-vending of newspapers. The term "newsboys" is one of art. Although many schoolboys sell newspapers, they are not included in the "appropriate units" of employees as that term is used in these proceedings.

The Board's final decisions of March 30, 1942, were based upon its findings in an earlier decision and direction of elections. Therein, with respect to the status of newsboys within the described appropriate units, the Board found in effect: Circulation managers control the general execution of policies relating to newspaper distribution. District managers distribute the newspapers published by their respective companies in assigned geographical areas. Each district manager is admittedly an employee of the company whose paper he distributes. The newspapers are delivered to newsboys, who sell them to the public, or to so-called checkmen, who redistribute them to newsboys on neighboring corners. For their services the checkmen receive a small salary from the publisher. At least

to the extent of such services, they are admittedly employees of the publisher. Aside from their wholesaling activities, the checkmen occupy positions similar to that of ordinary newsboys.

The district manager charges the newsboy or checkman for papers delivered an amount set by the publisher, except in the case of the News, in which instance the district manager himself fixes the amount. The checkman charges the newsboy the same amount he pays the district manager. At the end of the selling period the newsboys settle with the district manager or the checkman, and the checkmen settle with the district manager, for the newspapers distributed to them. Except the Herald under some circumstances, the newsboys are given credit for all unsold newspapers returned. The publisher determines the price to be charged the public, and the newsboys retain for themselves the difference between that sum and the amount they pay the publisher.

The district managers determine the number of newspapers in excess of the established order which the newsboys must try to sell. In practice, the newsboys cannot determine the size of their established orders without the cooperation of the district manager.

The newsboy customarily obtains his corner by applying at the plant of the publisher where he consults the district manager, who allocates the street corners in his district. The publishers furnish boxes, racks, money change aprons, and placards advertising special features contained in the newspapers; the equipment is distributed without charge to the newsboys by the district managers with instructions as to its use. Generally, the newsboy is required to be at his post from the time the newspapers customarily appear on the street to the time settlement is made.

The Board found that the record is "replete," with instances in which district managers have removed, permanently or temporarily, newsboys from their corners or transferred them from one location to another. The record also contains evidence with respect to the extent of the publishers' supervision over the conduct of the newsboys while they are engaged in selling newspapers on the street; the diligence of the newsboys is closely observed by the circulation department.

As a general practice, the newsboys sell several newspapers and handle magazines although in some instances the publishers have objected to the handling of competing publications. As the same group of newsboys have been handling both the Herald and the News, the district managers of both have instructed the newsboys how to hold, display and call the two newspapers.

From such findings of fact the Board concluded that each publisher had sufficient right to control its newsboys' manner and means of performing their activities to support the relationship of employer and employee for the purposes of the Act.

Each petitioner has consistently contended that it need not bargain collectively with the Union (1) because the newsboys engaged in street sales are not its employees, (2) because the group designated by the Board is not an appropriate unit for collective bargaining purposes, and (3) because the activities of the newsboys involved have no tendency to lead to labor disputes burdening commerce nor do they affect commerce within the meaning of the Act.

The National Labor Relations Board has no jurisdiction over a controversy between a newspaper publisher and its newsboys unless the latter are employees of the former. §§ 1, 2 (3), (5), (9), 7, 9(a), (b) and (c) of the Act, 29 U.S.C.A. §§ 151, 152 (3), (5), (9), 157, 159(a), (b) and (c). Therefore, a primary consideration is the question whether such newsboys are employees within the meaning of the Act.

The Act does not specifically define either the term "employer" or the term "employee," but says simply "the term 'employee' shall include any employee."[2] Since the Act contains no precise definitions, the publishers contend that Congress

---

[2] National Labor Relations Act § 2(3), 29 U.S.C.A. § 152(3): "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the chapter explicitly states otherwise, and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse."

intended to use the words in their ordinary and conventional sense as understood at the time the statute was enacted. The Board takes the position that a larger classification than that envisioned by common law or other statutes was contemplated. In its brief it concludes that "where the persons involved function in a realistic economic sense as employees of an industrial enterprise Congress intended them to be within the Act." In its decision and direction of election in the certification proceedings, in discussing § 2(3) of the Act, it asserts that: "In cases where the status of an individual was challenged, we have indicated that the statutory definition of the term 'employee' embraces all employees in the conventional as well as legal sense, except those by express provision excluded and that the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act."

 We believe that the Board's position cannot be supported. The rule that an administrative application of a general statute is conclusive unless arbitrary, Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301; Sunshine Coal Co. v. Adkins, 310 U.S. 381, 399, 60 S.Ct. 907, 84 L.Ed. 1263; Shields v. Utah Idaho Central R. Co., 305 U.S. 177, 59 S.Ct. 160, 83 L.Ed. 111, is not applicable to the situation under consideration. Contrary to the cases cited, there is no delegation to an administrative body of power to determine whether the facts are within a specified exception to a statute, the exercise of which power involves an interpretation of terms. Rather does the instant case fall within the general rule that "the interpretation of the meaning of statutes, as applied to justiciable controversies, is exclusively a judicial function." United States v. American Trucking Ass'ns, Inc., 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345.

 Since the term "employee" is not defined in the Act, we agree with petitioners' contention that it must be given its conventional meaning as developed under the common law and statutory enactments. Such a result is in accord with the basic theory of statutory interpretation that the legislature is presumed to use words in their ordinary sense unless that sense is contradicted by the context of a statute.

Old Colony R. Co. v. Commissioner, 284 U.S. 552, 560, 52 S.Ct. 211, 76 L.Ed. 484; Kepner v. United States, 195 U.S. 100, 124, 24 S.Ct. 797, 49 L.Ed. 114, 1 Ann.Cas. 655; Levy's Lessee v. McCartee, 6 Pet. 102, 110, 8 L.Ed. 334; Commissioner v. Plestcheef, 9 Cir., 100 F.2d 62, 64. Since the principle is a long established one, it would seem that if Congress had intended to enlarge upon the common meaning of "employee," it would have specifically so stated in the Act, which sets out specific definitions to several terms used in the Act.

The dictionary definition of "employee" is "one employed by another; one who works for wages or salary in the service of an employer," Webster's New International Dictionary, 2nd Ed., 1937.

The term "employee" has been interpreted under several federal statutes, other than the National Labor Relations Act, in like manner based upon a broad policy of public benefit. In connection with the Federal Employers' Liability Act, § 1, 45 U.S.C.A. § 51, the Supreme Court stated: "We are of the opinion that Congress used the words 'employee' and 'employed' in the statute in their natural sense, and intended to describe the conventional relation of employer and employee." Robinson v. Baltimore & Ohio Rr. Co., 237 U.S. 84, 94, 35 S.Ct. 491, 494, 59 L.Ed. 849. In accord: Hull v. Philadelphia & Reading Ry. Co., 252 U.S. 475, 479, 40 S.Ct. 358, 64 L.Ed. 670. In connection with the Social Security Act, § 804, 42 U.S.C.A. § 1004, this court asserted: "However, in defining the required relationship, and in drawing the distinctions between an employee and an independent contractor, the regulations [defining an employee as one who is subject to the control of his employer with respect to what shall be done and as to how it shall be done] do no more than reiterate the familiar principles of the common law," Anglim v. Empire Star Mines Co., 9 Cir., 129 F.2d 914, 917. In accord: Jones v. Goodson, 10 Cir., 121 F.2d 176; Texas Co. v. Higgins, 2 Cir., 118 F.2d 636. A similar result was reached in connection with the Merchant Marine Act, 46 U.S.C.A. § 688, Loe v. Goldstein, 9 Cir., 101 F.2d 967, and with the Federal Safety Appliance Act (45 U.S.C.A. § 11), Stevenson v. Lake Terminal R. Co., 6 Cir., 42 F.2d 357.

█ In determining status as between employee and independent contractor the basic inquiry is where the right to control lies, and the control referred to must be

complete control of the means and methods of performance. See 39 C.J. 1316, Master and Servant § 1518. State court decisions exemplifying these principles in cases involving the status of newsboys under state workmen's compensation acts are plentiful and persuasive. The leading case in California is New York Indemnity Co. v. Industrial Accident Commission, 213 Cal. 43, 1 P.2d 12, where newsboys engaged in the street sale of newspapers under circumstances similar to those in the instant case were held not to be employees [3] of the publishers. The newsboy sold for two different publishers newspapers which he bought from a district manager. A certain place on the streets was allotted to each newsboy, who received instructions from the district manager not to intrude upon the place allotted to another. The boy was required to be diligent in selling his papers, or further copies would be refused him and his place would be assigned to another. The district manager was to supervise the activities of the newsboys so as to achieve the sale of as many newspapers as possible. The court held: " * * * we are constrained to hold that the limited amount of control which the publishers of these two newspapers undertook to exercise over the newsboys * * * who daily purchased from their district manager a specified number of copies of their daily issues for a specific sum payable in cash or at the close of each day's sales, and who undertook the retailing of the same to such customers among the public at large as they were able to attract or procure at a specified place and price fixed by the publishers, would not as a matter of law be sufficient to constitute such newsboys the employees of the publishers of said newspapers * * *." 1 P.2d 15. The rule upon which the decision was based was followed in State Compensation Fund v. Industrial Accident Commission, 216 Cal. 351, 14 P. 2d 306; and in Hartford Accident & Indemnity Co. v. Industrial Accident Commission, 123 Cal.App. 151, 10 P.2d 1035. Even though some degree of supervision is exercised, other state decisions have emphasized the lack of a control extensive enough to constitute the newsboy an employee of the publisher. Birmingham Post Co. v. Sturgeon, 227 Ala. 162, 149 So. 74; Bernat v. Star-Chronicle Pub. Co., Mo.App., 84 S.W. 2d 429; Creswell v. Charlotte News Pub. Co., 204 N.C. 380, 168 S.E. 408; Balinski v. Press Pub. Co., 118 Pa.Super. 89, 179 A. 897.

The question for decision as to each newspaper separate from any other paper is whether there is substantial evidence that the publisher exercises, or has the right to exercise, sufficient control over the activities of the newsboys defined in its appropriate unit to support the Board's decision that they were employees under § 2(3) of the National Labor Relations Act.

■ Each publisher in its brief points out in detail the only testimony relating to it that could support the Board's findings. We shall not attempt to distinguish between the evidence separately referable to each publisher in view of the fact that we believe, even though all the testimony be applied to all petitioners, or that induced upon behalf of each be applied to it alone, that there is not substantial evidence herein to support the Board's determination that the newsboys are "employees" of the publishers. Cf. Matter of Houston Chronicle Publishing Co., 28 NLRB 1043.

We have received an amicus curiae brief from the International Printing Pressmen and Assistants' Union of North America, affiliated with the American Federation of Labor. The point is developed and emphasized therein that the vending of a newspaper by a newsboy is the sale of an intangible service and an integral part of the dissemination of the news from reporter to reader, rather than a sale of tangible personal property. We have studied the brief carefully, and conceding the point made as correct for the sake of argument, we do not follow the brief writer to his conclusion that it affects the status of the vendor in his relation with the newspaper publisher. The service rendered by the newspaper to the paper reader may be rendered either through the agency of an employee or through a contractual agreement with the vendor or through a sale to him for resale to the reader.

In each instance the publisher had at best a limited control over the activities of the newsboys inadequate to constitute it an employer under § 2(3) of the Act. The profits

---

[3] California Labor Code, § 3000, St. 1937, p. 261 (formerly § 2009 of California Civil Code): "A servant is one who is employed to render personal service to his employer, other than in the pursuit of an independent calling, and who in such service remains entirely under the control and direction of the employer, who is called his master."

to the newsboys consisted of the difference between the price paid to the publisher and the price paid by the public. That both prices were fixed by the publisher is not an authoritative indication of control. A similar practice is frequently followed in the consigning of merchandise by a manufacturer to a retailer under agreements to sell at the price fixed by the manufacturer. During the period between the delivery of the newspapers to a newsboy and his paying the district manager for them at the close of each selling day, the boy accounts for the number of newspapers left with him. His is the risk of loss if a newspaper is accidentally destroyed or is stolen. The fact that the burden of loss without fault falls upon the newsboy together with the fact that his compensation results from the variance between the wholesale and retail price of the commodity he vends, fits very closely to the boy's status as an independent merchant and does not fit at all to the status of an employee. The extension of credit for a few hours from delivery to the day's end accounting is no indication that the debtor is an employee. On the contrary, it is evidence of an independent status of the newsboy. Whether or not the newspapers are sold to the newsboy when he takes them from the distributor or whether or not the newspapers are entrusted to the newsboy under an agreement tacit or express to account to the newspaper management for all papers not returned does not go to the essentials of the relation of employer and employee.

The fact that newsboys dealt in other and often in competing publications is a significant factor pointing toward their independence. Also notable is the practice of buying and selling valuable corners in some instances without the publisher's knowledge or expressed approval of the transactions. Since the place of business of a newsboy is a public street or sidewalk, neither the publisher nor the boy has any proprietory right to any "corner" or locality. The fact that the newsboys do not encroach on one another's territorial jurisdiction is principally a result of a tacit understanding between them based in large measure, it would seem, upon the old law of prior possession and ability to defend a squatter's privilege. Personal conflict over this vendor privilege is not a rarity though it is the exception to the rule of acquiescence. It should be mentioned that many of the newsboys hired at will other boys and relief men to help them sell newspapers in their selected territory, and dismissed them at will.

The Board's finding that the record is "replete" with examples of the removal of newsboys from their corners by district managers is misleading, as in every instance the newspaper merely refused to deliver further copies of its publication to the newsboy, thereby exercising the full extent of its power in the premise. The right of a dealer to terminate his relationship with a retailer by refusing to deliver further merchandise is part of the normal understanding between them, and consequently, such a right cannot be relied upon as tending to constitute one the employer and the other the employee. In effect, "the only control which * * * [the district manager had over the newsboys] was to refuse to sell them any newspapers if they would not respect the usual customs or understanding prevalent among news dealers," Balinski v. Press Pub. Co., 118 Pa.Super. 89, 179 A. 897, 899.

■ Even though it is conceded that the so-called checkmen are employees of the publisher to the extent that they function as wholesalers, they need not occupy the same status to the extent that they function as newsboys. State Compensation Ins. Fund v. Industrial Accident Commission, 2 Cal.2d 94, 39 P.2d 201. See, also, 71 C.J. 477, Master and Servant, § 207. We think the Board is not supported by substantial evidence in its finding that the "newsboys" are employees of the publisher whose newspaper they vend.

The order in each case is set aside.

DENMAN, Circuit Judge (dissenting).

The question here is whether these adult news vendors, miscalled boys, are employee selling agents of the publishers or independent contractors, who obtain title when a certain sum is charged against them on their receipt of the papers from the publishers. If I were free to draw my own inferences from the testimony, I would decide that they were independent contractors, engaged in their own businesses on their respective spots.

However, we are not free to draw our own inferences, and the sole question before us is whether the Board reasonably could infer from the varied incidents of the relationship between the men and the publishers that it is one of employer and employee. Cf. my dissenting opinions in the two cases of National Labor Relations

Board v. Citizen News Co., 9 Cir., 134 F.2d 962, and Id., 9 Cir., 134 F.2d 970, filed April 8, 1943, and April 16, 1943, respectively.

I do not regard the fact that on receipt of the papers by these men a certain amount is charged against them, as conclusively showing a passage of title to them. Employees are frequently charged with the value of the employer's property entrusted to the employees' care, and later docked for an equal amount for negligent loss or misuse.

No general bill of sale or written or other agreement existed showing an independent contractor relationship. To me it is significant that with the long period of dispute over that relationship, no such an agreement was in fact made. Nothing in the National Labor Relations Act prevents one from arranging his business relations with another in any form he chooses to select.

Since there is no necessary inference of a sale, I cannot say that, with the evidence of controls usually exercised by employers, the Board could not rationally infer that the men were employees who collected the money for the papers and, as compensation for their services to the publishers, were allowed to keep the difference between the amount charged and the selling price.